**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES EDWARD BARBER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:16-cv-00473-RDP** |
| | ) | |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner, Alabama Department** | ) | |
| **of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

In capital litigation, the stakes are high. Fortunately, counsel who represent capital defendants are generally (and admirably) committed to their chosen work. It is hard work; lawyers who represent capital defendants feel the full weight of the world (or, at least, their client's life and future) on their shoulders. They must pour heart, soul, and health (not to mention resources) into their trade. And, when they are unsuccessful (as they often are), they realize that every move they make will be second guessed. That is the way it is and must be, because Congress and the courts have established a rigorous framework to review counsel's conduct to ensure counsel provided constitutionally adequate representation. Additionally, the federal habeas statute requires federal courts to review state courts' handling of a prisoner's conviction, sentence, and postconviction claims. Before the state can "wield the sword," as a general rule, that type of review must occur. This case is no different. Petitioner James Edward Barber has presented a number of claims which call upon this court to review both his trial counsel's and the state courts' handling of his trial, appeal, and postconviction proceedings.

One of Barber's claims presents a particularly interesting question: What happens when counsel's performance is limited not by the lawyer's unreasonable deficiency but, rather, by a

client's own choices? The Supreme Court has spoken directly to that scenario. And, that is the circumstance presented by the first of Barber's claims in this case. During his pretrial proceedings and at his trial, Barber insisted he did not kill Dorothy Epps. In fact, he did. There is no question about that. After his trial and direct appeal, he admitted it. But earlier, in the trial court, Barber insisted he was innocent and refused to permit his lawyers to present any defense that would have involved admitting he killed Epps.

Not until after his conviction and death sentence became final did Barber change his tune. He now says he killed Epps, but there were mitigating circumstances involved. He was intoxicated when he killed her and did not kill her during a robbery. Both these defenses had the potential, if believed by the jury, to spare Barber's life. But, they were never asserted. Barber says they should have been. He claims that, even though he insisted at the time that his lawyers not present those defenses, their failure to present them violated his constitutional right to effective assistance of counsel.

Barber makes a number of other claims, too. He raises a *Strickland* claim based on his counsel's penalty-phase performance, challenges certain rulings of the state trial and appellate courts, and makes claims based on the prosecution's conduct and other circumstances of his trial. Accordingly, he has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2003 capital murder conviction and death sentence in Alabama state court. (Doc. # 1). The parties have fully briefed Barber's claims. (Docs. # 1, 20, 23). After careful consideration of each of his claims in light of the record, the pleadings, and the applicable provisions of 28 U.S.C. § 2254, the court concludes that Barber has not shown he is entitled to habeas relief. Accordingly, and for the reasons stated below, his petition for a writ of habeas corpus is due to be denied.

# **Table of Contents**

I.  Background and Procedural History .......................................................... **6**

II.  Standard of Review ................................................................................ **8**

III.  Barber's Claims for Relief .................................................................. **11**

   A.  Barber's Guilt-Phase *Strickland* Claim ........................................ **11**

     1.  Barber's Arguments ................................................................ **13**

       a.  Failure to Investigate Alternative Defenses ........................ **14**

       b.  Pursuit of an "Impossible" Innocence Defense ................... **17**

       c.  Prejudice ............................................................................. **18**

     2.  The State Court's Decision ..................................................... **20**

     3.  The State Court's Decision Was Reasonable .......................... **24**

       a.  Deficient Performance ........................................................ **25**

          i.  Investigation of Alternative Defenses ............................ **25**

          ii.  Pursuit of Innocence Defense at Trial ........................... **31**

       b.  Prejudice ............................................................................. **34**

   B.  Barber's Penalty-Phase *Strickland* Claim .................................... **36**

     1.  Barber's Arguments ................................................................ **37**

       a.  Failure to Conduct a Reasonable Mitigation Investigation ............................. **37**

       b.  Prejudice ............................................................................. **40**

     2.  The State Court's Decision ..................................................... **41**

    3.     The State Court's Decision Was Reasonable...................................... **44**

        a.     Deficient Performance .......................................................... **44**

        b.     Prejudice ................................................................................ **47**

           i.     Mitigation Evidence at Barber's Penalty-Phase Trial ................................... **47**

           ii.    Mitigation Evidence at Barber's Rule 32 Hearing ........................................ **51**

           iii.   Reweighing the Mitigation Evidence ................................. **53**

**C.**   **Barber's Claims That the Trial Court Improperly Precluded the Jury from Considering Certain Mitigation Evidence and Failed to Instruct the Jury Regarding Mercy** ................................................................. **57**

    1.     **The Trial Court's Instructions Regarding the Testimony of Barber's Family and Friends** ............................................................... **58**

    2.     **The Trial Court's Failure to Give an Instruction Regarding Mercy** ..................... **60**

**D.**   **Barber's *Ring v. Arizona* Claim** ...................................................... **63**

    1.     **Relevant Supreme Court Precedent** .......................................... **63**

    2.     **Alabama's Capital Sentencing Scheme and Barber's Death Sentence** ................. **65**

    3.     **The State Court's Rejection of Barber's Claim Was Reasonable** .......................... **67**

**E.**   **Barber's Claim That His Indictment Was Defective** ................................. **70**

**F.**   **Barber's Claims Based on the State Court's Reliance on *Ex Parte Waldrop*, 859 So. 2d 1181 (Ala. 2002) in Affirming His Death Sentence** .................... **72**

**G.**   **Barber's Claim Based on the Trial Court's Admission of Testimony About the Partial Palm Print** ............................................................... **77**

**H.**   **Barber's Claim That the State Vouched for the Credibility of Its Witnesses** .......... **82**

1.    Barber's Arguments and the State Court's Decision ............................................... 82

2.    Relevant Supreme Court Precedents ........................................................... 83

3.    The State Court's Rejection of Barber's Vouching Claim Was Reasonable ........ 86

I.    Barber's Claim That the Trial Court Permitted Improper Opinion Testimony at the Penalty Phase ........................................................... 88

J.    Barber's Claim That Alabama's Death-Qualification Process Produced a Conviction-Prone Jury in Violation of His Right to an Impartial Jury.................. 89

K.    Barber's Claim That the State's Decision to Seek the Death Penalty Was Impermissibly Influenced by the Victim's Family Members ...................... 90

1.    Factual Background........................................................... 91

2.    Analysis ........................................................... 92

a.    The State Court's Factual Determination Stands................................. 93

b.    The State Court's Rejection of Barber's Claim Was Reasonable.................... 94

L.    Barber's Claims That the Prosecutor Made Impermissible Comments on His Failure to Testify and Impermissibly Shifted the Burden of Proof to Him.............. 99

1.    Factual Background........................................................... 99

2.    The Prosecutorial-Commentary Claim.......................................... 100

3.    The Burden-Shifting Claim........................................................... 102

M.    Barber's Claim Based on the Trial Court's Admission of Barber's Confession .... 103

N.    Barber's Claim Based on the Jury Viewing Him in Shackles and Handcuffs ........ 104

O.    Barber's Cumulative-Effect Claim ........................................................... 108

IV.    Conclusion ........................................................... 108

# I.    Background and Procedural History

To discuss the issues raised by Barber's federal habeas petition, the court need only briefly recount the crime at issue. Barber was convicted and sentenced to death in Madison County, Alabama, for the murder of Dorothy Epps during the course of a first-degree robbery. *See* Ala. Code § 13A-5-40(a)(2); *Barber v. State*, 952 So. 2d 393, 400 (Ala. Crim. App. 2005). Barber knew Epps before killing her. *Barber*, 952 So. 2d at 401. He previously had a romantic relationship with Epps' daughter, and he had performed repair work at the Epps home in the past. *Id.* at 401, 405. One weekend in May 2001, Barber entered Epps' home while she was alone and beat her to death. *Id.* at 401-05. There was no evidence of forced entry at the Epps home, making it more likely than not that Barber gained access to the home easily because of his acquaintance with Epps. *Id.* at 401. The evidence at trial showed that Barber first struck Epps in the face with his fist and then inflicted multiple blunt-force injuries using a claw hammer. *Id.* The medical examiner who performed Epps' autopsy found evidence of nineteen different lacerations and seven fractures in the head or skull caused by the blows. *Id.*

Crime scene investigators discovered a large amount of Epps' blood all around the area she was found, including the floor, walls, furniture, and ceiling. *Id.* at 402. They also found a bloody palm print on a counter in the area where Epps was found. A latent print examiner with the Huntsville Police Department later compared the bloody print to the known palm print of Barber and testified unequivocally that the palm print found on the countertop was Barber's. *Id.* at 402.

State authorities took Barber into custody on May 24, 2001, less than one week after the murder. *Id.* at 403. Investigator Dwight Edger interviewed Barber three times between May 23 and May 25, 2001, and each time Barber waived his *Miranda* rights and agreed to speak with

Edger. *Id.* at 404. In the first two interviews Barber denied any knowledge of the crime, but in the third interview he confessed to the crime after Edgar informed him that officers had recovered his bloody palm print from the crime scene. *Id.* at 404-05.

During the third interview, Barber became very emotional and stated that "he had been using cocaine all day" on the day of the murder and that "he was really 'f—ed up' and did not plan to kill the victim." *Id.* at 404. He went on to describe Epps' killing in some detail:

> And I was going over to see [Epps] . . . I stopped over there and was going to talk to her about the shutters and all of a sudden I just figured, well, you know, she's probably got a few bucks, you know, I should ask her for some money, and I just turned around and hit her. Something came over me, I just BOOM—turned around and hit her.

(Vol. 23 at 1238). Barber further explained in the third interview that he:

> hit the victim with his hands and then with a hammer; that he threw the hammer in the trash and took the trash bag; that he took the victim's purse because it looked good and not to rob her; and that he threw the bag, purse, and his shoes in a dumpster at a carwash.

*Barber*, 952 So. 2d at 405. During the third interview, Barber estimated that he killed Epps around 7:00 pm on Saturday, May 19, 2001. *Id.*

Barber was tried for capital murder in Madison County Circuit Court. His trial began on December 9, 2003. (State Court Record, Vol. 8, Tab R-10 at 407).[1] On December 15, 2003, the jury found Barber guilty of murdering Epps during the course of a robbery. (Vol. 11 at 1189). On December 16, 2003, the jury recommended by a vote of eleven to one that Barber be sentenced to death. (Vol. 12, Tab R-32 at 1330). On January 9, 2004, the trial court accepted the recommendation of the jury and sentenced Barber to death. (Vol. 12, Tab R-34 at 1361; Vol. 12, Tab R-35 at 270).

---

[1] References to the state court record are designated "(Vol. _ at _ )." The court will list any page number associated with the record by reference to the number in the upper right hand corner of the page, if available. Otherwise, the page number will correspond with the number at the bottom of the page. Additionally, citations to the record will generally include an easily identifiable tab number close to the cited material where available.

Barber appealed to the Alabama Court of Criminal Appeals, challenging his conviction and sentence on a variety of constitutional grounds. *See generally Barber*, 952 So. 2d 393. The Court of Criminal Appeals affirmed Barber's conviction and sentence. *Id.* at 464. The Court of Criminal Appeals denied Barber's petition for rehearing on July 8, 2005, and the Alabama Supreme Court denied his petition for writ of certiorari on September 22, 2006. *Id.* at 393. The Supreme Court of the United States denied Barber's petition for writ of certiorari on March 26, 2007. *Barber v. Alabama*, 549 U.S. 1306 (2007).

Barber filed a petition for state postconviction relief under Alabama Rule of Criminal Procedure 32. (Vol. 17, Tab R-47 at 14). After conducting a hearing, the Madison County Circuit Court denied his petition. (Vol. 22, Tab R-59 at 1115). The Alabama Court of Criminal Appeals affirmed. (Vol. 29, Tab R-65 at 26). Barber then filed an application for rehearing in the Court of Criminal Appeals, which was denied. (Vol. 29 at Tab R-66). Finally, Barber filed a petition for writ of certiorari in the Alabama Supreme Court on August 17, 2015. (Vol. 29 at Tab R-67). The Alabama Supreme Court denied the petition on September 25, 2015. (Vol. 29 at Tab R-68).

In March 2016, Barber filed his federal habeas petition in this court. (Doc. # 1). Respondent Jefferson Dunn, Commissioner of the Alabama Department of Corrections, asserts that each of Barber's claims for relief lacks merit and that the petition is therefore due to be denied. (Doc. # 20). Barber has filed a reply brief in support of his petition. (Doc. # 23). Before addressing the merits of Barber's petition, the court explains the standard of review that applies to his claims.

## II.    Standard of Review

Each of the claims raised in Barber's federal habeas petition was previously raised on direct appeal from his conviction or in state postconviction proceedings. Because Barber

petitioned the Alabama Supreme Court for a writ of certiorari both on direct appeal and following postconviction proceedings, he has "invok[ed] one complete round of [Alabama's] established appellate review process" and thereby exhausted his state court remedies as required by 28 U.S.C. § 2254(b)(1). *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Smith v. Jones*, 256 F.3d 1135, 1141 (11th Cir. 2001); *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003). Thus, there are no exhaustion or procedural default issues raised by Barber's federal habeas petition.

The claims in Barber's petition are governed by the deferential standard of review mandated by Congress in 28 U.S.C. § 2254(d). Under that standard, a federal court may grant habeas corpus relief to a state prisoner for claims adjudicated on the merits by a state court only if the petitioner shows that the state court proceedings resulted in a decision that was:

(1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or

(2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(1), (2); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (stating that § 2254(d) requires a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal citation and quotation marks omitted)). This court's review of Barber's claims under § 2254(d)(1) is limited to the record that was before the state courts that adjudicated those claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Similarly, the state courts' decisions must be "measured against [the Supreme] Court's precedents as of the time" the state courts rendered their decisions. *Id.* at 182 (internal quotation marks omitted).

Section 2254(d)(1)'s "contrary to" clause applies when the state court reaches a conclusion "opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Jones v. GDCP Warden*, 753 F.3d 1171, 1182 (11th Cir. 2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (brackets omitted). An "unreasonable application" of Supreme Court precedent under § 2254(d)(1) occurs when the state court "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quoting *Williams*, 529 U.S. at 413) (brackets omitted). The Supreme Court has explained that an "unreasonable application of" its prior holdings must be "objectively unreasonable," not merely wrong; so, even "clear error" will not suffice to allow relief under this clause of § 2254(d)(1). *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Rather, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" a prior holding of the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This question, the Supreme Court has observed, is "the only [one] that matters under § 2254(d)(1)." *Lockyer*, 538 U.S. at 71. To the extent that Barber disputes a factual determination by the state courts, this court may only overturn a state court's factual findings if Barber "produces 'clear and convincing evidence' that those findings are erroneous." *Jones*, 753 F.3d at 1182 (quoting 28 U.S.C. § 2254(e)(1)).

To determine whether Barber is entitled to habeas relief based on a claim that was adjudicated on the merits in state court, a federal habeas court looks to the decision of "the last state court to decide [the] claim . . . ." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008) ("[T]he highest state court decision

reaching the merits of a habeas petitioner's claim is the relevant state court decision."). In Barber's case, the relevant decisions are the opinions of the Alabama Court of Criminal Appeals affirming his conviction and sentence on direct appeal, *Barber v. State*, 952 So. 2d 393 (Ala. Crim. App. 2005), and affirming the denial of his Rule 32 petition in postconviction proceedings, (Vol. 29, Tab R-65 at 1-26). Where, as here, the last state court to decide a prisoner's federal claim "explains its decision on the merits in a reasoned opinion," a federal court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson*, 138 S. Ct. at 1192.[2]

The court's review of Barber's § 2254 petition is highly deferential to the state courts' resolution of his claims. *See Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008). If "fairminded jurists could disagree" on the correctness of the state court's decision, federal habeas relief is precluded. *Harrington*, 562 U.S. at 101.

## III.    Barber's Claims for Relief

Barber, through counsel, has asserted a number of claims in his § 2254 petition. The court addresses each, in turn.

### A.    Barber's Guilt-Phase *Strickland* Claim

Barber first claims he received ineffective assistance of counsel at the guilt phase of his trial, in violation of the Sixth Amendment as interpreted in *Strickland v. Washington*, 466 U.S. 668 (1984). (Doc. # 1 at 29-78)

---

[2] When the last state court to decide a prisoner's federal claim on the merits does so without a reasoned opinion, the Supreme Court has instructed federal habeas courts to "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and to then "presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. Here, the Alabama Supreme Court declined to engage in discretionary review of Barber's conviction and sentence either on direct appeal or during his Rule 32 proceedings. Thus, the last state court to consider Barber's claims on the merits was the Alabama Court of Criminal Appeals, which provided reasoned opinions both on direct appeal and on appeal from the denial of Barber's Rule 32 petition. *Wilson*'s "look through" rule is therefore inapplicable in this case.

An ineffective assistance of counsel claim under the Sixth Amendment has two elements. First, a defendant "must show that counsel's performance was deficient." *Strickland*, 466 U.S. 668, 687 (1984). Second, he must show that counsel's deficient performance prejudiced his defense. *Id.*

To establish deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Harrington*, 562 U.S. at 104 (internal quotation marks omitted). Reasonableness must be determined by reference to "prevailing professional norms." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting *Strickland*, 466 U.S. at 688). Reviewing courts "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104. The burden is on the defendant to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (quoting *Strickland*, 466 U.S. at 687).

To establish prejudice, a defendant "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). To show prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693). Rather, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). In other words, "[t]he likelihood of a different result" absent counsel's deficient performance "must be *substantial*, not just conceivable." *Id.* at 112 (emphasis added).

The Supreme Court has described *Strickland*'s standard as "highly deferential." *Id.* at 105 (internal quotation marks omitted). It has explained that "[s]urmounting *Strickland*'s high bar is never an easy task." *Id.* (internal quotation marks omitted). Thus, when reviewing a state court's adjudication of a *Strickland* claim under § 2254(d)'s highly deferential standard, a federal court must be "doubly deferential." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (internal quotation marks omitted). That means giving "both the state court and the defense attorney the benefit of the doubt." *Id.* Because "[t]he *Strickland* standard is a general one," "the range of reasonable applications" under § 2254(d) "is substantial." *Harrington*, 562 U.S. at 105. Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Barber raised his guilt-phase ineffective assistance claim before the Alabama Court of Criminal Appeals when he appealed the denial of his Rule 32 petition. He contends the Court of Criminal Appeals unreasonably rejected his guilt-phase ineffective assistance of counsel claim. The court divides its discussion of this claim into three parts. First, it recounts Barber's arguments that he received ineffective assistance of counsel at the guilt phase of his trial. Second, it reviews the state court's reasoning in rejecting Barber's claim. Third, it explains why the state court neither acted contrary to nor unreasonably applied clearly established Supreme Court precedent in rejecting Barber's claim.

### 1. Barber's Arguments

Barber argues his trial counsel were deficient during the guilt phase of his trial for two principal reasons: (1) they failed to adequately investigate and discuss with Barber two alternative lines of defense and (2) they pursued an "impossible" innocence defense at trial to the

exclusion of other more viable defenses they could have presented. He claims trial counsel's performance prejudiced him because evidence he presented in state postconviction proceedings actually proved the alternative defenses that trial counsel failed to investigate and present at trial, and those alternative defenses could have reduced his conviction from a capital offense to a noncapital offense.

### a.     Failure to Investigate Alternative Defenses

*First*, Barber faults his trial counsel for failing to thoroughly investigate and present a manslaughter defense based on evidence that he was intoxicated at the time of the crime. Barber claims it was objectively unreasonable for his counsel not to investigate and inform him of the possibility of arguing that he was so intoxicated at the time of the killing that he was incapable of forming the specific intent to kill required for a murder conviction under Alabama law. (Doc. # 1 at ¶¶ 59-75). Barber's argument is based on several sources of evidence tending to show his intoxication at the time of the crime and his general propensity for substance abuse.

In Barber's videotaped confession to police, he stated that on the day he killed Epps:

> [I] had been doing coke all day long at my house. The stuff just makes you fucked up. And I was going over to see [Epps] . . . I stopped over there and was going to talk to her about the shutters and all of a sudden I just figured, well, you know, she's probably got a few bucks, you know, I should ask her for some money, and I just turned around and hit her. Something came over me, I just BOOM—turned around and hit her.
>
> . . .
>
> I just turned around and hit her. I don't know why, I just . . . I guess I was just all fuckin' drugged up and . . . I don't know. I was, I was fucking insane almost, you know.

(Vol. 23 at 1238, 1241). Barber's videotaped confession was admitted in evidence at trial and played for the jury. (Vol. 10 at 981-82). There is no dispute Barber's counsel were aware of the confession.

Trial counsel were also aware that Barber had a history of substance abuse and addiction. Barber explained his experience with cocaine addiction in his videotaped confession:

> And once you start doing, you just can't stop. I mean, once you start doing that stuff, you can't stop doing it. It takes a hold of you and you just—you spend every fucking penny you got on it. It makes you all fucked up. But yet you can't stop doing it.

(Vol. 23 at 1242).

Dr. Marianne Rosenzweig, a forensic and clinical psychologist hired to assess Barber's competency to confess, also reported Barber's history of cocaine and alcohol abuse to Barber's counsel: "[Barber] was using a few hundred dollars' worth [of cocaine] at a time twice a week at the time that he was arrested [for Epps' murder]. . . . Mr. Barber also reports that he has had a problem with alcohol since his early 20's . . . ." (Vol. 23 at 1210-11). In light of this evidence, Barber claims his trial counsel's failure to investigate and discuss a manslaughter defense with him was objectively unreasonable.

*Second*, Barber also faults his trial counsel for failing to thoroughly investigate and discuss with him a defense based on the theory that Barber committed robbery as a mere afterthought to the murder. In Alabama, murder is a capital offense if committed during a first-degree robbery. Ala. Code § 13A-5-40(a)(2). The state charged Barber with capital murder based on the allegation that he killed Epps during the commission of a robbery—specifically, that he stole her purse after beating her to death. (Vol. 1, Tab R-1 at 9). Under Alabama law, "a robbery committed as a 'mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery." *Connolly v. State*, 500 So. 2d 57, 63 (Ala. Crim. App. 1985). Barber argues that statements in his confession showed he lacked the intent to rob Epps before killing her. He claims his trial counsel unreasonably failed to

investigate and inform him of the mere afterthought defense, which, if implemented, could have reduced his conviction from capital to noncapital murder.

Barber claims several statements in his taped confession show that his theft of Epps' purse was a "mere afterthought," unrelated to his decision to kill her. He points to his description of the killing as unplanned, illogical, and purposeless:

> I mean I just don't even know how it happened like. I just kinda snapped. I mean, we weren't arguing or nothing . . . I just thought I needed some money, you know. . . I just figured, well, you know, she's probably got a few bucks, you know, I should ask her for some money, and I just and I just turned around and hit her. Something came over me. I just BOOM—turned around and hit her. I don't know why.

(Vol. 23 at 1236, 1238). He also points to his response when asked what he did with Epps' purse: "I didn't take the purse to rob her. I just figured it looked good, I was like, freaking out." (Vol. 23 at 1237). In light of this evidence, Barber claims his trial counsel's failure to investigate and discuss a mere afterthought defense with him was objectively unreasonable.

Barber admitted to killing Epps at his Rule 32 evidentiary hearing, but at the time of his trial "he insisted . . . that he was innocent and had nothing to do with Epps's murder." (Vol. 29, Tab R-65 at 14). Indeed, the state courts found that Barber "would not consider any defense that required him to admit that he killed Epps" and that he "refused" to consider "trying the case on the basis that [he] was intoxicated when he killed Epps." (*Id.* at 13). Barber nevertheless maintains that "just because a defendant insists he is innocent and demands that counsel pursue[ ] an innocence defense does not make it reasonable for counsel to follow his wishes." (Doc. # 1 at 46, ¶ 88). In short, Barber argues his counsel were deficient for failing to "make an informed evaluation of all possible defenses" and "have meaningful discussions with [him] about these defenses and the realities of the case." (*Id.*). The import of his argument is that, had counsel investigated and discussed the manslaughter and mere afterthought defenses with him, Barber

likely would have instructed counsel to pursue those defenses instead of complete innocence, thereby potentially avoiding a capital conviction.

### b. Pursuit of an "Impossible" Innocence Defense

Finally, in addition to failing to investigate and inform him of alternative defenses, Barber faults his trial counsel for in fact pursuing an innocence defense at trial -- a defense he now characterizes as "impossible" -- instead of the more viable manslaughter and mere afterthought defenses discussed above. Barber claims evidence that could have been used to support both the intoxication and mere afterthought defenses was presented at trial, despite counsel's failure to investigate. Specifically, Barber points to statements in his videotaped confession regarding his cocaine usage on the day of the crime and his statement, "I didn't take the purse to rob her. I just figured it looked good . . . ." (Vol. 23 at 1237). Because the confession was played for the jury, Barber claims it was objectively unreasonable for his trial counsel not to argue the intoxication and mere afterthought defenses to the jury. Though Barber recognizes that his counsel obtained jury instructions on the lesser-included offenses of manslaughter, felony murder, and intentional murder (Vol. 11, Tab R-21 at 1147-55), and specific instructions regarding the intoxication and mere afterthought defenses (*Id.* at 1152-53, 1166), he claims the manslaughter instruction "was rendered meaningless because Trial Counsel failed to make any argument to the jury that Mr. Barber's intoxication at the time of the offense could have deprived him of the requisite intent." (Doc. # 1 at 50-51). He also criticizes his trial counsel for making "only a half-hearted attempt" to argue that the state failed to prove the killing occurred during the commission of a robbery. (*Id.* at 53). In short, Barber claims it was objectively unreasonable for his counsel to primarily pursue an innocence defense at trial and to give short shrift to what he contends were the more viable intoxication and mere afterthought defenses.

c.      **Prejudice**

Barber claims he was prejudiced by his trial counsel's failure to investigate and discuss the manslaughter and mere afterthought defenses with him and their decision to instead pursue an innocence defense at trial. He argues that evidence presented at his Rule 32 hearing proved the manslaughter and mere afterthought defenses. And though he does not expressly argue it, Barber implies that had his trial counsel adequately investigated and discussed the manslaughter and mere afterthought defenses with him, he would have instructed his counsel to pursue those defenses at trial instead of the innocence defense he insisted on at the time.

At his Rule 32 hearing, Barber testified about his drug and alcohol use on the day he killed Epps and the day prior to the killing. (Vol. 26 at 403-14). He prefaced his testimony by stating, "Like I said, my memory is what it is and I can't tell you every time I stopped and got crack during this period. But I'm going to do my best." (*Id.* at 403). He also gave the following caveat about his estimates of the amount of drugs and alcohol he consumed prior to killing Epps: "I mean, you know, none of these numbers that I'm giving you are gospel because it's a long time ago and I was pretty messed up." (*Id.* at 407). He proceeded to testify that on the day before he killed Epps he smoked several hundred dollars' worth of crack cocaine, likely took four to seven prescription pain pills, and drank a case of beer and a large bottle of wine. (*Id.* at 404-07). He fell asleep that night and woke up at approximately 6:00 or 6:30 am the next morning. (*Id.* at 407). On the day of the crime, Barber testified that he continued to use crack cocaine, prescription pain pills, and alcohol prior to killing Epps. (*Id.* at 408). When asked how much alcohol he drank that day, Barber responded: "I couldn't tell you with any -- really with any kind of truth to it. It was quite a bit." (*Id.* at 408). He nevertheless proceeded to testify that he smoked several hundred dollars' worth of crack cocaine, took at least four to five prescription pain pills,

and drank at least a case of beer before killing Epps that evening. (*Id.* at 409-14). Barber described the extent of his intoxication at this point, shortly before he killed Epps, as "very, very intense," and stated he was "very wasted." (*Id.* at 414).

Barber also offered the expert testimony of Dr. Alexander Morton at his Rule 32 hearing to explain how his alleged intoxication could have affected his ability to form the intent required for a murder conviction. (*Id.* at 452-521). Dr. Morton testified that crack cocaine users can be "mildly violent to extremely violent" and can experience cognitive impairment. (*Id.* at 483, 486-87). Dr. Morton also testified that using the combination of substances Barber used on the day he killed Epps could lead the user to be unable to control his actions. (*Id.* at 510).

Barber also testified regarding the mere afterthought defense at his Rule 32 hearing. He stated that he went to Epps' home to pick up a shutter he had been repairing for her. (*Id.* at 412). He described his attack on Epps as unprovoked and unplanned. (*Id.* at 414-15) ("[I] just seemed to snap . . . and I don't know why. . . . I do know that I [killed her]. And I don't know why."). And he explained that his intent to steal Epps' purse did not arise until sometime after the killing, when he returned to the crime scene to make it look like Epps had been killed by a random intruder during a robbery. (*Id.* at 417) ("I thought, 'Maybe I can make it look like a crime,' you know, 'somebody broke in here.' So I moved a few things around, pulled out the phone jacks. And I threw her pocketbook in that garbage bag with the hammer. . . . And I left and I went home.").

Finally, Barber also testified at his Rule 32 hearing that his trial counsel failed to discuss with him the possibility of pursuing the manslaughter or mere afterthought defenses to obtain a noncapital conviction. (*Id.* at 426-27).

Based on the evidence presented at his Rule 32 hearing, Barber contends there is a "reasonable probability that, but for [his] counsel's unprofessional errors," the result of his guilt-phase trial would have been different. *Strickland*, 466 U.S. at 694. He suggests that had his counsel adequately investigated the manslaughter and mere afterthought defenses, and discussed those defenses with him, he likely would have instructed his trial counsel to pursue those alternative defenses in hopes of obtaining a noncapital conviction. And, he claims that had counsel pursued those alternative defenses at trial instead of an "impossible" innocence defense, there is a reasonable probability that he would have been convicted of manslaughter or noncapital murder.

### 2. The State Court's Decision

Barber presented his *Strickland* claims to the state courts in a Rule 32 postconviction proceeding. The Alabama Court of Criminal Appeals affirmed the Rule 32 court's denial of Barber's guilt-phase ineffective assistance claim. (Vol. 29, Tab R-65 at 10-19). The Court of Criminal Appeals held that Barber's counsel were not deficient for failing to pursue the manslaughter and mere afterthought defenses because both defenses "would have required Barber to admit that he killed Epps," and "[t]estimony at the evidentiary hearing revealed that Barber denied killing Epps" at the time of his trial and instead "insisted that trial counsel pursue an innocence defense." (*Id.* at 12). In light of Barber's insistence that trial counsel pursue an innocence defense, the state court concluded that "Barber failed to prove that counsel were ineffective in their investigation and presentation of alternative defenses." (*Id.* at 14). The court also found that "Barber failed to prove that he was prejudiced by counsels' decision not to present alternative defenses" at trial. (*Id.*). The relevant portions of the state court's opinion are worth quoting in full:

[B]oth [the manslaughter and mere afterthought] lines of defense would have required Barber to admit that he killed Epps. Testimony at the evidentiary hearing revealed that Barber denied killing Epps and insisted that trial counsel pursue an innocence defense. Barber's trial counsel testified that he "made sure Mr. Barber knew all about the evidence and all about the discovery material that we had, the evidence that the State would have -- was intending to present at trial to convict him, and also the law that applied to all of that." (R. 61.) Trial counsel also testified that he and co-counsel discussed with Barber the option of pursuing lesser-included offenses as well as presenting evidence that Barber was intoxicated at the time of the crime. The following exchange occurred during the evidentiary hearing:

"[Barber's Rule 32 Counsel]: Were you aware in December 2003 that in a capital case, where specific intent is an element of the offense, that you could have put on a case involving voluntary intoxication to mitigate the guilt?

"[Barber's Trial Counsel]: Yes.

"[Barber's Rule 32 Counsel]: Did you consider that in December 2003?

"[Barber's Trial Counsel]: Yes.

"[Barber's Rule 32 Counsel]: Did you discuss that with Mr. Barber?

"[Barber's Trial Counsel]: Yes.

"[Barber's Rule 32 Counsel]: So you were aware that was an option but you chose not to litigate the case on that basis; correct?

"[Barber's Trial Counsel]: No. That's not correct. Mr. Barber was aware of it and refused to even discuss that option with us at all. And said, I will not consider anything but a trial on the facts; that I am not guilty."

(R. 67.)

Barber's trial counsel repeatedly testified that Barber would not consider any defense that required him to admit that he killed Epps. When asked again whether he talked to Barber about trying the case on the basis that Barber was intoxicated when he killed Epps, trial counsel stated that Barber "refused to go down that road and stated that he was not guilty." (R. 74.) The following exchange also occurred:

"[Barber's Rule 32 Counsel]: So, with respect to the lesser included offense charge, did you try the case on the basis of a theory that he was intoxicated at the time he committed the offense?

"[Barber's Trial Counsel]: That he could have been intoxicated at the time of the offense? I have no evidence that he was. And I couldn't suggest that he was because to suggest that he was intoxicated and should be found guilty of a lesser offense went against his desires to pursue an absolute not guilty innocence defense. So to answer --

"[Barber's Rule 32 Counsel]: But you didn't talk to him about -- I'm sorry.

"[Barber's Trial Counsel]: To answer your question. Did I pursue that in the courtroom? No.

"[Barber's Rule 32 Counsel]: Yeah.

"[Barber's Trial Counsel]: Now did we pursue it outside the courtroom prior to trial? Yes. And Mr. Barber was absolutely uncooperative with us on that regard and we could not make any progress with that."

(R. 74-75.) <u>See</u> <u>also</u> (R. 80) (Trial counsel testified that "[Barber] would not allow us to do anything other than tell the jury that he was absolutely not guilty.")

At the evidentiary hearing, Barber admitted that he killed Epps. (R. 430.) However, on cross-examination, the following exchange occurred:

"[Counsel for the State]: And throughout your entire representation with Mr. Tuten you always maintained, 'I didn't do it. I'm innocent.' Isn't that right, Mr. Barber?

"[Barber]: That's right."

(R. 450.) Thus, Barber's testimony at the evidentiary hearing reveals that he was dishonest with trial counsel and insisted that they investigate and pursue a defense theory that Barber knew was false.

In its order denying Barber's petition, the circuit court found that Barber failed to prove that counsel were ineffective in their investigation and presentation of alternative defenses. . . . Those findings are supported by the record.

. . . A review of the testimony and evidence presented at the evidentiary hearing reveals that Barber failed to prove that he was prejudiced by counsels' decision not to present alternative defenses. In order to present a viable manslaughter defense at trial, counsel would have been required to tell the jury that Barber killed Epps, albeit unintentionally. Similarly, in order to pursue a mere-afterthought defense, trial counsel would have to admit that Barber

committed the murder. However, both trial counsel and Barber made clear at the evidentiary hearing that Barber refused to admit that he killed anyone.

. . . .

Thus, trial counsel could not be ineffective for adhering to Barber's wishes. Barber's refusal to discuss other options left trial counsel with no alternatives. The record contains ample evidence that trial counsel informed Barber of the law as it related to his case but that Barber refused to consider anything other than an innocence defense. The record reveals that Barber voluntarily chose the course of action that trial counsel ultimately undertook. . . . *Barber cannot now claim that he was prejudiced by the course of action that he insisted counsel undertake. This rationale applies to Barber's claim regarding a manslaughter defense as well as his claim regarding a mere-afterthought defense as each defense would have required Barber to admit that he killed Epps*. . . .

Although it is not readily apparent from the face of his petition, the evidence that Barber presented at the evidentiary hearing as well as his arguments on appeal suggest that Barber's actual claim was not that trial counsel were ineffective simply for inadequately investigating alternate defenses and failing to present those defenses. Rather, it appears that Barber is arguing that trial counsel were ineffective for failing to convince him to change his mind and agree to admit that he killed Mrs. Epps. In his brief on appeal, Barber argues that his "insistence that trial counsel pursue an innocence defense does not absolve their failure to investigate the manslaughter defense." (Barber's brief at 34). Thus, it appears that Barber is arguing that, had trial counsel conducted the investigation that his Rule 32 counsel conducted, they would have been able to convince him to admit to the killing and could have then pursued alternative defenses.

However, the evidence presented at Barber's evidentiary hearing indicated that trial counsel did conduct an investigation into a manslaughter defense. According to trial counsel, he had an "untold" number of conversations with Barber about lesser-included offenses. (R. 62.) Although trial counsel did testify that he could not specifically remember a conversation with Barber about a manslaughter defense, the record contains a letter from trial counsel to Barber in which trial counsel told Barber: "Alcohol and/or drug abuse may give rise to defenses, mitigation evidence and grounds to suppress statements." (C. 1225.) Thus, the record contained evidence suggesting that trial counsel did investigate and discuss this matter with Barber. Barber failed to offer any evidence, other than his own self-serving testimony, that a more thorough investigation would have enabled trial counsel to convince him to admit that he killed Epps.

Rule 32.3, Ala. R. Crim. P., provides that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Furthermore, "'[w]hen there is conflicting testimony as to a factual matter . . . , the question of the credibility of

the witnesses is within the sound discretion of the trier of fact.'" Calhoun v. State, 460 So. 2d 268, 269-70 (Ala. Crim. App. 1984), quoting State v. Klar, 400 So. 2d 610, 613 (La. 1981)). Because the record contained evidence suggesting that counsel conducted an investigation into alternative lines of defense and discussed those defenses with Barber, the circuit court was correct in finding that Barber failed to prove that counsel were ineffective during the guilt phase of his trial.

We also note that, in trial counsel's above-mentioned letter to Barber, counsel discussed evidence that he was investigating at Barber's request. For example, counsel told Barber that he was, at Barber's request, attempting to locate Barber's cellular telephone records and inquired as to why those records were important. Counsel also informed Barber that he had filed a motion to compel the State to allow him to view the physical evidence and was seeking a court order to view the crime scene. Thus, counsel's pretrial investigation appears to have been driven, at least in part, by Barber's false assertion that he was innocent. This supports trial counsel's testimony that Barber "refused to even discuss" the possibility that trial counsel put on a case involving voluntary intoxication. (R. 67.)

In fact, the record reveals that trial counsel spent a great deal of time investigating an innocence defense based on Barber's misrepresentations. For example, trial counsel testified that he spent time investigating two alibis that Barber put forth, i.e., that Barber could not have committed the crime because he was at home cooking spaghetti when Epps was killed and that Barber was with a prostitute during the time frame in which Epps was killed. (r. 139-41.) According to trial counsel, neither alibi proved to be plausible. At the evidentiary hearing, Barber even testified that trial counsel met with him "at least 11 times" regarding the bloody palm print that was found at the scene. (R. 435-36.)

Had Barber been [as] honest with trial counsel about his involvement in Epps's murder as he eventually was with Rule 32 counsel, trial counsel would not have wasted time and resources pursuing fruitless leads to support Barber's claim of innocence. This further supports the trial court's determination that Barber did not receive ineffective assistance of counsel during the guilt phase of his trial. Barber failed to prove that, had trial counsel conducted a more extensive investigation into a manslaughter defense, they would have been able to convince him to admit that he killed Epps.

(Vol. 29, Tab R-65 at 12-18).

### 3.    The State Court's Decision Was Reasonable

The Alabama Court of Criminal Appeals did not act contrary to or unreasonably apply

*Strickland* when it rejected Barber's guilt-phase ineffective assistance claim. The state court

concluded Barber failed to establish either element of a *Strickland* claim—*i.e.*, that his trial counsel's performance was deficient or that he suffered prejudice from their performance. Neither determination was contrary to or involved an unreasonable application of clearly established Supreme Court precedent.

### a. Deficient Performance

Barber claims the state court unreasonably concluded that his trial counsel were not deficient either for failing to adequately investigate and apprise him of the manslaughter and mere afterthought defenses or for pursuing an innocence defense at trial instead of those arguably more viable defenses. The court disagrees—neither determination by the Court of Criminal Appeals was unreasonable.

### i. Investigation of Alternative Defenses

The state court did not act contrary to clearly established Supreme Court precedent[3] or unreasonably apply *Strickland* in concluding Barber's trial counsel acted reasonably in their investigation of alternative defenses. As *Strickland* itself explained, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691. A defense lawyer's investigative decisions are frequently and "quite properly" based on "information supplied by the defendant." *Id.* "[W]hat investigation decisions are reasonable depends critically on such information." *Id.* Thus, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.*

---

[3] Barber has identified no Supreme Court case involving "materially indistinguishable facts" that has reached a decision opposite the state court's, so the state court's decision does not run afoul of § 2254(d)'s "contrary to" clause. *Jones*, 753 F.3d at 1182 (internal quotation marks omitted).

The Alabama Court of Criminal Appeals reasonably applied these principles to conclude that any failure by trial counsel to more extensively investigate the manslaughter and mere afterthought defenses and to present those defenses at trial was reasonable in light of Barber's repeated assertions of innocence and his insistence that trial counsel pursue an innocence defense at trial. (Vol. 29, Tab R-65 at 14-16). The state court found ample record evidence "that trial counsel informed Barber of the law as it related to his case but that Barber refused to consider anything other than an innocence defense." (*Id.* at 16); *see also* (Vol. 24, Tab R-60 at 100-01 (trial counsel explaining that he was aware of the mere afterthought defense before trial but that "Mr. Barber would not allow" him to defend the case on that basis). Testimony from Barber's Rule 32 hearing showed that trial counsel repeatedly tried to persuade Barber to consider other lines of defense besides complete innocence but that Barber steadfastly and unequivocally refused to do so. (Vol. 29, Tab R-65 at 14) (quoting trial counsel's testimony that Barber "would not allow us to do anything other than tell the jury that he was absolutely not guilty"); (Vol. 24, Tab R-60 at 84) (testimony by trial counsel: "I told [Barber], Let's do something other than say you're not guilty. And he flatly refused to even discuss that with us. . . . Every time I met with him I begged him to let us do something to save his life and he flatly refused."); (*id.* at 102-03) (trial counsel explaining that he "remember[s] numerous conversations about all defenses in this case with Mr. Barber and several conversations [specifically] about [the mere afterthought defense]" and that he encouraged Barber to pursue that defense). Based on this testimony, the state court concluded that "trial counsel could not be ineffective for adhering to Barber's" desire to pursue an innocence defense. (Vol. 29, Tab R-65 at 16). In its view, "Barber's refusal to discuss other options left trial counsel with no alternatives." (*Id.*).

There is certainly a "reasonable argument" that Barber's trial counsel "satisfied *Strickland*'s deferential standard" by declining to put scarce resources toward investigating defenses that Barber categorically refused to consider at the time of his trial. *Harrington*, 562 U.S. at 105. Given the time and resource constraints inherent in every trial, it was not unreasonable for the state court to conclude that Barber's counsel acted reasonably by choosing to spend "a great deal of time investigating an innocence defense" based on Barber's steadfast insistence that counsel put on a complete innocence defense at trial instead of wasting precious time and resources pursuing alternative defenses their client refused to consider. (Vol. 29, Tab R-65 at 18). As *Strickland* itself explained, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." 466 U.S. at 691. The Alabama Court of Criminal Appeals reasonably applied this principle to reject Barber's guilt-phase ineffective assistance claim.

Additionally, the Court of Criminal Appeals credited Barber's trial counsel with investigating various alternative defenses (including specifically the manslaughter defense) and discussing those defenses with Barber. (Vol. 29, Tab R-65 at 12-13, 17). Barber now challenges various factual findings made by the Court of Criminal Appeals in support of its conclusion that trial counsel performed a reasonable investigation of alternative defenses. Because "a determination of a factual issue made by a State court shall be presumed to be correct," Barber has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) ("State court findings of historical facts made in the course of evaluating an ineffectiveness claim

are subject to a presumption of correctness under 28 U.S.C. § 2254(d)."). For the reasons explained below, Barber has not carried that burden.

In crediting Barber's trial counsel with investigating alternative defenses and discussing them with Barber, the state court referenced trial counsel's testimony that "Mr. Barber was aware" that evidence of intoxication could mitigate guilt in a capital murder case but that Barber "refused to even discuss that option with us at all." (Vol. 29, Tab R-65 at 12-13). The court likewise referenced trial counsel's testimony that he "pursue[d] [a lesser-included offense strategy] outside the courtroom prior to trial" and had "an 'untold' number of conversations with Barber about lesser-included offenses." (*Id.* at 13, 17). The court also relied upon a letter from trial counsel to Barber explaining that "[a]lcohol and/or drug abuse may give rise to defenses . . . ." (*Id.* at 17). Based on this evidence, the Court of Criminal Appeals found that that trial counsel did in fact conduct an investigation into a manslaughter defense, but that Barber was simply unwilling to consider pursuing that defense further. (*Id.* at 17). And though the state court did not expressly reference it, the record reveals that trial counsel discussed the mere afterthought defense with Barber and encouraged him to pursue it, but that Barber simply refused "to admit he committed the homicide." (Vol. 24, Tab R-60 at 102-03).

Barber claims the state court's factual findings were unreasonable in light of the evidence presented at his Rule 32 hearing, which he claims showed that trial counsel in fact failed to adequately investigate the manslaughter and mere afterthought defenses and discuss those defenses with Barber. But Barber's argument fails for at least two reasons. First, Barber has not met his burden under § 2254(e)(1) of providing "clear and convincing evidence that [the state court's factual] findings are erroneous." *Jones*, 753 F.3d at 1182 (internal quotation marks omitted). Barber points to trial counsel's statement at the Rule 32 hearing, "I'm not sure I

specifically talked to [Barber] about manslaughter," as evidence that trial counsel did not investigate or discuss a manslaughter defense with him before trial. (Vol. 24, Tab R-60 at 80). But Barber's current counsel are cherry picking the record. For example, they fail to note that, when trial counsel was asked whether he spoke with Barber "about trying the case on the basis . . . that he was intoxicated when he killed the victim," trial counsel answered, "Yes. But [Barber] refused to go down that road and stated he was not guilty." (Vol. 24, Tab R-60 at 74). Indeed, trial counsel repeatedly stressed at the Rule 32 hearing that he attempted to pursue alternatives to an absolute innocence defense before trial but that Barber would not consider anything besides a complete innocence defense. (Vol. 24, Tab R-60 at 74-84). It was not unreasonable for the state court to conclude that trial counsel looked into an intoxication/manslaughter defense based on this testimony.

Barber also points to the following Rule 32 hearing testimony by Dr. Rosenzweig, whom trial counsel hired to conduct a psychological evaluation of Barber:

> [Rule 32 Counsel:] Were you ever specifically asked by Mr. Barber's lawyers to evaluate Mr. Barber's mental state at the time of the offense?

> [Dr. Rosenzweig:] I don't recall that I was asked specifically to do that.

(Vol. 25 at 193). Barber claims trial counsel's failure to ask Dr. Rosenzweig to investigate Barber's mental state at the time of the crime is further evidence the state court's finding that trial counsel investigated a manslaughter defense was unreasonable. But Barber fails to note that Dr. Rosenzweig's Rule 32 hearing testimony and penalty-phase trial testimony reveals she evidently *did* investigate Barber's mental state at the time of the crime—indeed, she was able to give an opinion on that issue during the penalty phase of Barber's trial. (Vol. 25 at 196) ("I said I did not think that [Barber] had the intent to kill [Epps].”); (Vol. 12, Tab R-27 at 1265-66) (Dr. Rosenzweig explaining that she did not believe Barber intended to kill Epps). Barber's Rule 32

counsel faulted trial counsel for failing to have Dr. Rosenzweig testify regarding Barber's intent at the time of the crime during the guilt phase of Barber's trial. (*Id.* at 197; Vol. 24, Tab R-60 at 89-91). But calling Dr. Rosenzweig to testify for that purpose would have required trial counsel to admit Barber's guilt, in violation of his resolute insistence that counsel maintain his innocence. (Vol. 24, Tab R-60 at 90) (Barber's trial counsel explaining that though they considered calling Dr. Rosenzweig to testify about Barber's mental state when he killed Epps, they chose not to "[b]ecause Mr. Barber would have none of it and would not allow us to do it. To do so would have required him to admit that he was involved in perpetrating this crime and he would not do it."). And in any event, whether or not trial counsel asked Dr. Rosenzweig to investigate Barber's mental state at the time of the crime casts no doubt at all on the state court's *other* factual findings (discussed above) supporting its conclusion that trial counsel adequately investigated alternative defenses. Barber has failed to prove by clear and convincing evidence that the state court's factual determinations were erroneous.

Barber's attack on the state court's factual findings supporting its denial of Barber's *Strickland* claim also fails for a second, more fundamental reason. Even if the court were inclined to agree with Barber that the Court of Criminal Appeals unreasonably credited trial counsel with performing a more thorough investigation of alternative defenses than they in fact did (and, to be clear, the court is not so inclined), it still would not conclude that the state court unreasonably applied *Strickland* in denying Barber's claim. As explained above, *Strickland* teaches that "what investigation decisions are reasonable depends critically" "on information supplied by the defendant." 466 U.S. at 691. So, even if trial counsel in fact performed a less thorough investigation than the state court credited them with performing, that does not mean their investigation was so deficient as to fall below *Strickland*'s deferential standard. As

explained above, there is without question a "reasonable argument" that Barber's trial counsel "satisfied *Strickland*'s deferential standard" by deciding to focus their investigative energies on issues other than alternative defenses to innocence that Barber categorically refused to consider at the time of his trial. *Harrington*, 562 U.S. at 105.

In short, Barber has not shown by clear and convincing evidence that the state court's factual determinations regarding trial counsel's investigation of alternative defenses were erroneous. That conclusion is based upon the record, and is further buttressed by Barber's categorical refusal to consider any defense besides complete innocence. Indeed, his refusal to consider alternative defenses would have rendered a decision by counsel to focus their scarce investigative resources on other issues entirely reasonable. Taken both independently and in combination with one another, these two realities create a "reasonable argument" that Barber's trial counsel "satisfied *Strickland*'s deferential standard." *Id.* Habeas relief is therefore precluded.

### ii.        Pursuit of Innocence Defense at Trial

The state court also did not unreasonably apply *Strickland* in concluding that Barber's trial counsel acted reasonably by pursuing an innocence defense at trial, rather than the manslaughter and mere afterthought defenses. Indeed, far from being constitutionally *required* to contradict Barber's wishes and present the manslaughter or mere afterthought defenses at trial, trial counsel may well have been constitutionally *forbidden* from doing so. *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1507-10 (2018).

*McCoy* involved a defendant charged with capital triple murder whose defense counsel, faced with overwhelming evidence of his client's guilt, believed the best chance of avoiding a death sentence lay in admitting his client's guilt at trial and then pleading for mercy from the jury at the penalty phase. *Id.* at 1505-07. Counsel also planned to argue that McCoy "should be

convicted only of second-degree murder, because his mental incapacity prevented him from forming the requisite specific intent to commit first degree murder." *Id.* at 1506 n.1 (internal quotation marks omitted). McCoy, however, much like Barber in this case, "adamantly objected" to his counsel admitting his guilt at trial. *Id.* at 1505. Rather than concede guilt and seek only to avoid the death penalty, McCoy demanded his counsel pursue acquittal and argue he was innocent. *Id.* at 1506.

McCoy's counsel was convinced that was a losing strategy. So, instead of following his client's wishes, counsel chose to follow his "experienced-based view" and, in hopes of saving his client's life, admit to the jury that McCoy had killed the victims. *Id.* at 1505, 1506-07. Though at the penalty phase counsel "urged mercy in view of McCoy's 'serious mental and emotional issues,'" the jury was unpersuaded. *Id.* at 1507. It returned three death verdicts. *Id.*

The Supreme Court reversed McCoy's conviction and granted him a new trial, holding that the Sixth Amendment affords a defendant "the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *Id.* at 1505. Though litigation strategy remains the province of defense counsel, the Court explained that certain decisions in a criminal case concerning the *objective* of the representation are reserved for the client alone. *Id.* at 1508. Those decisions include, for example, "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *Id.* at 1508. Because the decision whether to maintain innocence at the guilt phase of a capital trial strikes at the heart of a client's autonomy to decide the objectives of his defense, the Court concluded the decision could only be made by McCoy. *Id.* Counsel's decision to override McCoy on this issue therefore violated his right to the "Assistance of Counsel" guaranteed by the Sixth Amendment. *Id.* at 1507.

Barber's case is strikingly similar to *McCoy*. In both cases, experience suggested that admitting to a killing provided the best chance for a client to avoid the death penalty, but both McCoy and Barber adamantly and repeatedly objected to that strategy. (*See* Vol. 24, Tab R-60 at 84) (testimony by Barber's trial counsel: "I told [Barber], Let's do something other than say you're not guilty. And he flatly refused to even discuss that with us. . . . Every time I met with him I begged him to let us do something to save his life and he flatly refused.").[4] Unlike McCoy's lawyer, however, Barber's trial counsel *honored* his desire to maintain his innocence at trial. Yet, Barber now contends his trial counsel violated the Sixth Amendment by, rather presciently, adhering to the Sixth Amendment rule announced in *McCoy* years later.[5] Though *McCoy* had not been decided at the time of Barber's trial, it is at the very least strong evidence that the state court was not unreasonable to conclude that Barber's counsel satisfied *Strickland*'s deferential standard. If, as *McCoy* holds, the Sixth Amendment *forbids* a lawyer from confessing to a killing over the client's objection, then there is a reasonable argument that -- even pre-

---

[4] As noted above, Barber's trial counsel testified repeatedly and unequivocally at the Rule 32 hearing that Barber "would not allow us to do anything other than tell the jury that he was absolutely not guilty." (Vol. 24, Tab R-60 at 80); *see also* (*id.* at 74) ("I couldn't suggest that [Barber] was [intoxicated] because to suggest that he was intoxicated and should be found guilty of a lesser offense went against his desires to pursue an absolute not guilty innocence defense."); (*id.* at 83) (explaining he did not call a particular witness "because to do so [he] would have had to admit Mr. Barber committed the crime and [Barber] was not willing to do that nor let us do it"). Barber himself corroborated trial counsel's testimony with his own statements. When the state asked Barber whether, throughout his entire representation with trial counsel, he "always maintained, 'I didn't do it. I'm innocent,'" Barber responded "That's right." (Vol. 26 at 450).

[5] The prescience of Barber's trial counsel is rather remarkable. Indeed, he appears to have complied with *McCoy* (before it was decided) almost to the letter. *McCoy* made clear that though counsel "could not interfere with McCoy's telling the jury 'I was not the murderer,'" counsel "could, if consistent with providing effective assistance, focus his own collaboration on urging that McCoy's mental state weighed against conviction." 138 S. Ct. at 1509. To be sure, that is exactly what Barber's trial counsel did in this case. When asked by Rule 32 counsel whether he argued an intoxication defense at trial, trial counsel responded, "As best we could without going against what Mr. Barber had told us to do in his defense." (Vol. 24, Tab R-60 at 79); *see also* (Vol. 11, Tab R-19 at 1111) (trial counsel's closing argument explaining that the jury must assess "was the Defendant intoxicated to negate the intent of what he was doing . . . those are the things that you have to recognize). Trial counsel also argued the mere afterthought defense to the jury at closing argument and suggested the state had not proved Epps was killed during the course of a robbery. (Vol. 11, Tab R-19 at 1109-10). Thus, trial counsel did an admirable job of respecting Barber's desires concerning the objective of his defense while simultaneously "focus[ing their] own collaboration" on highlighting lesser-included offenses the jury might find to be supported by the evidence. *McCoy*, 138 S. Ct. at 1509.

*McCoy* -- the Sixth Amendment did not *require* Barber's counsel to do what *McCoy* now forbids (namely, ignore Barber's sustained insistence that counsel pursue an innocence defense at trial and instead admit that Barber killed Epps). It would be odd indeed to hold that Barber's trial counsel was constitutionally ineffective for anticipating and adhering to the Sixth Amendment rule announced in *McCoy*. The court declines to do so.

### b.    Prejudice

Alternatively, even if the Alabama Court of Criminal Appeals' conclusion that Barber's trial counsel acted reasonably was unreasonable, its conclusion that Barber failed to show prejudice was not. To establish prejudice, a defendant "must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrington*, 562 U.S. at 104 (internal quotation marks omitted). In Barber's case, that standard requires him to make two showings. *See Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000). First, he must show a reasonable probability that, had counsel adequately investigated and apprised him of alternative defenses to innocence, he would have permitted counsel to pursue those alternative defenses instead of insisting on maintaining absolute innocence. *See id.* Second, he must show that had counsel more aggressively pursued the alternative defenses at trial, there is a reasonable probability the jury would have found him guilty of a lesser-included offense. *See id.* Without making both showings, Barber cannot show a reasonable probability of a different result (*i.e.*, a *non*capital conviction). However, Barber can make neither showing and thus has failed to establish prejudice.

The evidence reviewed above thoroughly refutes the idea that Barber would have been more open to other defenses besides innocence if only his counsel had more thoroughly investigated those defenses and more assertively discussed those defenses with him. As to

investigation, it was not for lack of information that Barber was unwilling to consider an intoxication or mere afterthought defense. Barber knew better than anyone his state of mind when he killed Epps. His counsel also reviewed the relevant evidence with him. (Vol. 24, Tab R-60 at 61). If, based on his own memory of the event, refreshed by his counsel's review of the evidence, Barber was unwilling to consider an intoxication or mere afterthought defense at the time of trial, no additional investigation by trial counsel would have been remotely likely to change his mind. As to informing Barber of the alternative defenses to innocence available to him, the record shows that trial counsel repeatedly discussed alternative defenses with Barber and urged him to let them present those defenses at trial, to no avail. (*Id.* at 74-84); *see especially* (*id.* at 84) (testimony by trial counsel: "I told [Barber], Let's do something other than say you're not guilty. And he flatly refused to even discuss that with us. . . . Every time I met with him I begged him to let us do something to save his life and he flatly refused."). The state court was not unreasonable to conclude based on this evidence that Barber "failed [to show] that a more thorough investigation would have enabled trial counsel to convince him to admit that he killed Epps." (Vol. 29, Tab R-65 at 17).

Even if trial counsel had convinced Barber to let them try his case on a manslaughter or mere afterthought theory, Barber has failed to show the jury likely would have convicted him of a noncapital offense. Though Barber claims he was severely intoxicated when he killed Epps, he was able to describe the crime in considerable detail in his videotaped confession, as the state noted in its closing argument. (Vol. 11, Tab R-20 at 1126-30). Moreover, the jury heard the evidence of Barber's intoxication contained in his confession and received intoxication and manslaughter instructions from the trial judge, but still convicted Barber of capital murder.[6]

---

[6] This is perhaps unsurprising since Alabama law imposes a high standard to establish an intoxication defense: "to negate the specific intent required for a murder conviction, the degree of the accused's intoxication

35

(Vol. 11, Tab R-21 at 1152-55). Barber has not shown the jury likely would have reached a different conclusion if he had presented a manslaughter defense as his primary trial strategy. And though Barber now claims he formed the intent to steal Epps' purse only after he killed her, statements in his videotaped confession suggested money motivated the killing. (Vol. 23 at 1238) ("I stopped over there and was going to talk to [Epps] about the shutters and all of a sudden I just figured, well, you know, she's probably got a few bucks, you know, I should ask her for some money, and I just turned around and hit her."). Moreover, trial counsel argued the mere afterthought defense in closing argument (Vol. 11, Tab R-19 at 1109-10), but the jury rejected it and instead convicted Barber of capital murder. Barber has not shown the jury would likely have reached a different result had he made the mere afterthought defense the centerpiece of his trial strategy.

Barber has failed to show that, but for his counsel's unprofessional errors, he likely would have been willing to pursue a different strategy: admit at trial that he killed Epps, but offer mitigation evidence. He also has failed to show that, had he admitted to killing Epps and offered such mitigation evidence, the jury likely would have convicted him of a lesser, noncapital offense. As he has not made both showings, the state court's conclusion that Barber failed to show prejudice was reasonable and may not be disturbed on habeas review.

Because the state court's adjudication of Barber's guilt-phase ineffective assistance claim was reasonable, Barber is not entitled to federal habeas relief on that claim.

### B.   Barber's Penalty-Phase *Strickland* Claim

Barber also claims the Alabama Court of Criminal Appeals unreasonably rejected his penalty-phase ineffective assistance of counsel claim. (Doc. # 1 at 78-119). The court divides its

---

must amount to insanity." *Whitehead v. State*, 777 So. 2d 781, 832 (Ala. Crim. App. 1999) (internal quotation marks omitted); (Vol. 11, Tab R-21 at 1153).

discussion of this claim into three parts. First, it recounts Barber's arguments that he received ineffective assistance of counsel at the penalty phase of his trial. Second, it reviews the state court's reasoning in rejecting Barber's claim. Third, it explains why the state court neither acted contrary to nor unreasonably applied clearly established Supreme Court precedent in rejecting Barber's claim.

### 1.     Barber's Arguments

Barber argues his trial counsel performed deficiently in the penalty phase of his trial because they failed to conduct a reasonable mitigation investigation. He argues he suffered prejudice because trial counsel failed to uncover substantial, noncumulative mitigation evidence that a reasonable investigation would have uncovered and that, if presented at the penalty phase, would have created a reasonable probability of the jury concluding "that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

### a.   Failure to Conduct a Reasonable Mitigation Investigation

The mitigation investigation Barber's trial counsel conducted consisted primarily of interviews conducted by Robert Tuten, one of Barber's lawyers, and Dr. Rosenzweig, a forensic psychologist hired to investigate potential mitigation evidence and prepare a mitigation report. Tuten's investigation involved speaking with Barber to gather information about his background that could aid trial counsel in uncovering mitigation evidence. (Vol. 24, Tab R-60 at 116). As part of his investigation, Tuten wrote down the names of six "friends and relatives of James Barber" who he believed "were potential sources for mitigation evidence." (Vol. 24, Tab R-60 at 117).[7] When asked what steps he took "to cause [those] people to be interviewed," Tuten replied that he "let Marianne Rosenzweig know about their existence." (Vol. 24, Tab R-60 at 118-19).

---

[7] The names Tuten wrote down were: "Elizabeth B.," "Mark B.," "Beverly Risedorf," "Darren B.," "Margaret Kitteridge," and "Ronald [Kitteridge]." (Vol. 24 at 1428).

Tuten also testified that he personally spoke with Barber's mother, Elizabeth, and brother, Mark, several times before they testified at the penalty phase of Barber's trial. (Vol. 24, Tab R-60 at 119). But he could not recall contacting any other friends, family members, or former employers of Barber, including Barber's ex-wife Teresa Starke and his ex-fiancé Rita Impalusso. (Vol. 24, Tab R-60 at 119-24).

Trial counsel relied primarily on their mitigation expert, Dr. Rosenzweig, to investigate potential sources of mitigation evidence. Barber argues Dr. Rosenzweig's investigation was woefully deficient and that it was objectively unreasonable for trial counsel to rely almost entirely on her mitigation investigation in preparing for the penalty phase of Barber's trial. Barber identifies three alleged shortcomings of Dr. Rosenzweig's investigation that he claims rendered the investigation objectively unreasonable.

First, Barber claims Dr. Rosenzweig spent too little time interviewing him. Dr. Rosenzweig met with Barber for three and a half hours on March 26, 2003—some eight months before Barber's trial began in December 2003. (Vol. 25 at 182-83, 198-99). She spent one and a half hours assessing whether Barber had been competent to confess and two hours interviewing Barber about mitigation evidence. (Vol. 25 at 182-83, 198-99). Barber claims two hours "was an unreasonably short amount of time" for Dr. Rosenzweig to spend "gathering information purporting to cover his entire 42-year life." (Doc. # 23 at 51). Barber also faults Dr. Rosenzweig for only conducting a single interview with him. He argues that a single interview is insufficient to cover the breadth of information a reasonable mitigation investigation requires and that multiple interviews are need to build rapport with a defendant and conduct follow-up. (Doc. # 23 at 52).

Second, Barber claims Dr. Rosenzweig's investigation into collateral sources was insufficient. Dr. Rosenzweig spent just over four hours conducting four phone interviews with collateral sources between April 6 and April 10, 2003. (Vol. 25 at 182-83, 198-99, 207). The four phone interviews were with Elizabeth Barber (Barber's mother), Mark and Glen Barber (Barber's brothers), and Keith Collins (a former employer or contractor Barber had worked for). (Vol. 25 at 207). Dr. Rosenzweig spoke with Mark Barber for two hours; Glen Barber for about an hour; Elizabeth Barber for about 45 minutes; and Keith Collins for about 20 minutes. (Vol. 25 at 238). She also spoke briefly with Sergeant Dunn at the Madison County jail, but forgot to list him as a collateral source in her mitigation report. (Vol. 25 at 238-39). Barber argues Dr. Rosenzweig's investigation of collateral sources was unreasonable for the following reasons: she interviewed too few sources; she did not spend enough time with the sources she did interview and failed to conduct follow-up or discuss her findings with Barber; she did not interview a diverse enough range of collateral sources and neglected to include Barber's extended family members, friends, ex-girlfriends, ex-fiancé, and ex-wife; and she did not properly interview the collateral sources but instead used the interviews "just simply to confirm what Mr. Barber had told [her] about himself," rather than pursuing other potential mitigation evidence beyond what Barber relayed himself. (Vol. 12, Tab R-27 at 1231).

Third, Barber claims Dr. Rosenzweig did not adequately review available records relating to his past. The records trial counsel provided to Dr. Rosenzweig consisted only of police and forensic records relating to Epps' death; they did not include any materials concerning Barber's background. (Vol. 25 at 189; Vols. 23-24 at 1383-1426). Dr. Rosenzweig testified she did not receive or review any of Barber's school records or records regarding Barber's medical history, health, family history, or employment history. (Vol. 25 at 203-05). Dr. Rosenzweig testified that

she may have asked Tuten to obtain Barber's medical records from a Huntsville hospital and police records from Barber's DUI arrest, but she never received them. (Vol. 25 at 202-03). Barber argues his defense's failure to obtain any records relating to his background during their mitigation investigation was objectively unreasonable. Taken together, Barber argues these shortcomings show his trial counsel performed deficiently at the penalty phase of his trial and that the contrary conclusion of the state court was unreasonable.

### b. Prejudice

Barber next argues he suffered prejudice from trial counsel's deficient mitigation investigation because trial counsel failed to uncover substantial, noncumulative mitigation evidence that a reasonable investigation would have uncovered. Had that evidence been presented at the penalty phase, Barber argues, it would have created a reasonable probability of the jury concluding "that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. The mitigation evidence Barber identifies falls into three categories.

First, Barber claims trial counsel failed to uncover evidence that he and his family have a history of mental illness. Testimony at Barber's Rule 32 hearing revealed that Barber's mother and grandmother experienced multiple nervous breakdowns in their lifetimes and that Barber's older sister was hospitalized for mental health issues relating to prolonged depression. (Vol. 25 at 291, 303-05, 336-38, 342-45). Testimony also revealed that Barber himself contemplated suicide on at least one occasion—he was found at home "with a gun in his mouth." (Vol. 25 at 350).

Second, Barber claims trial counsel failed to uncover that he had destructive role models during his childhood. Testimony at the Rule 32 hearing suggested that Barber's older brother and

older brother-in-law had been bad influences on Barber and used drugs or alcohol in his presence while Barber was growing up. (Vol. 25 at 314-15, 338-342).

Third, Barber claims trial counsel failed to uncover that he experienced a lack of parental discipline in his childhood. Testimony at the Rule 32 hearing suggested that Barber sometimes fought with his siblings as a child, regularly used drugs and alcohol during his teenage years, and possibly stole money from his father's gas station without receiving any meaningful disciplinary action from his parents. (Vol. 25 at 281, 283-84, 295). Barber's brother described the Barber household as "very lenient" and explained that it was difficult for his parents to adequately discipline all seven children. (Vol. 25 at 311-12).

Barber argues that the mitigation evidence presented at his Rule 32 hearing was not cumulative of the evidence presented at his trial. (Doc. # 23 at 73). He contends that had the evidence of Barber's personal and family history of mental illness, poor role models, and lack of parental discipline been presented at his trial, it would have created a reasonable probability of the jury not returning a death verdict.

### 2.    The State Court's Decision

The Alabama Court of Criminal Appeals rejected Barber's penalty-phase ineffective assistance claim for two reasons. First, the court found the claim barred by the doctrine of invited error because Barber was uncooperative with trial counsel and their mitigation expert in preparing for the penalty phase of his trial. (Vol. 29, Tab R-65 at 19-21). Second, the court found Barber failed to prove both the deficient performance and prejudice prongs of *Strickland*. (*Id.* at 21-26). Because this court concludes that the state court reasonably applied *Strickland* to deny Barber's claim, it need not address the state court's alternative holding that Barber's *Strickland*

claim was barred by the doctrine of invited error. The court therefore recounts only the deficiency and prejudice portions of the state court's analysis.

The Court of Criminal Appeals first held that Barber failed to prove deficient performance by trial counsel under *Strickland*. The court relied on the following evidence to conclude that trial counsel were not deficient:

> Trial counsel presented testimony from Barber's brother, Mark Barber, who testified that Barber had problems with drugs and started using marijuana and alcohol at the age of 12. Mark Barber also testified that, in his opinion, Barber was a good person who is supportive of his family. Barber's mother, Elizabeth Barber, also testified that Barber was a good son who helped her after her husband died. Additionally, Alex Dryer, a minister who knew Barber through a prison ministry, testified that Barber became a Christian while he was incarcerated and that Barber shared his religion with other inmates.

> Trial counsel also called Dr. Rosensweig as a mitigation expert to testify during the penalty phase. Dr. Rosensweig testified that she interviewed Barber as well as other collateral sources in order to confirm things that Barber told her. Rosensweig testified that she spoke with family members, a former employer, and an officer from the Madison County jail. Dr. Rosensweig was able to give detailed testimony regarding what she learned about Barber's childhood, his adolescent years, and his adult life. That testimony included information regarding Barber's drug use, including his use of crack cocaine, and how that drug use negatively affected his life. Dr. Rosensweig also testified regarding the differences in powdered cocaine and crack cocaine as well as the effects of crack cocaine use. Dr. Rosensweig even introduced a chart that graphically depicted the behavior effects of the progression of cocaine depend[e]ncy.

(*Id.* at 21-22).

> Based on this evidence, the state court concluded:

> Notwithstanding Barber's lack of cooperation, trial counsel was able to put forth a mitigation case that cast Barber as a person with a good heart who, for various reasons, began using drugs and alcohol. Trial counsel further put evidence before the jury that, because of this extensive drug use, Barber's brain did not function normally.

(*Id.* at 22).

The state court recognized that testimony presented at Barber's Rule 32 hearing suggested "that trial counsel could have done a more extensive mitigation investigation; that Dr. Rosensweig could have spent more time on her investigation and her evaluation of Barber and other collateral sources; and that additional expert testimony could have been presented regarding the effects of crack cocaine." (*Id.* at 22-23). But, the state court reasoned that it must distinguish "between counsel's complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome." (*Id.* at 23) (internal quotation marks omitted).[8] The court explained that "if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by <u>Strickland</u> will be hard to overcome." (*Id.*) (internal quotation marks omitted). The court classified Barber's claim as the latter type, concluding that trial counsel's investigation was reasonable and that "[t]he fact that Rule 32 counsel would have conducted a more extensive investigation and presented additional witnesses during the penalty phase does not render trial counsel's performance deficient." (*Id.* at 26).

Regarding prejudice, the state court concluded that Barber failed to show "what additional information or witnesses could have been provided that would have been so compelling it would have caused a different result at the penalty phase." (*Id.* at 26). Indeed, the

---

[8] The court recognizes that this language likely misstates the appropriate standard for evaluating *Strickland* claims based on counsel's failure to conduct a reasonable mitigation investigation. Counsel may conduct an unreasonable mitigation investigation that runs afoul of *Strickland* even if counsel conducts some investigation, but the investigation conducted is not adequate. But the state court's language on this point is immaterial to the court's analysis on habeas review. As explained below, the court need not decide whether the state court reasonably concluded that Barber failed to show deficient performance on his guilt-phase *Strickland* claim because, in any event, the state court reasonably concluded that Barber failed to show prejudice. *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (en banc) ("[I]f we conclude that the [state court] reasonably applied clearly established federal law when it decided that [petitioner] had failed to establish prejudice, we may affirm the denial of [the habeas] petition without addressing whether the performance of his counsel was deficient.").

court concluded that "much of [the testimony presented at the Rule 32 hearing] would have been cumulative to testimony that was offered during the penalty phase." (*Id.* at 23). Because Barber failed to show "that he was prejudiced by any of counsels' alleged failures," the court affirmed the Rule 32 court's denial of Barber's guilt-phase *Strickland* claim. (*Id.* at 26).

### 3. The State Court's Decision Was Reasonable

Barber argues the state court's rejection of his penalty-phase *Strickland* claim was contrary to and an unreasonable application of *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009); and *Sears v. Upton*, 561 U.S. 945 (2010). Whether the state court unreasonably concluded that trial counsel's performance was not deficient is a close question. But even assuming the state court's conclusion on that point was unreasonable, its holding that Barber failed to establish prejudice was not. Thus, Barber is not entitled to habeas relief on this claim.

### a. Deficient Performance

At the penalty phase of a capital trial, *Strickland*'s first prong requires counsel "to conduct a thorough investigation of the defendant's background" for the purpose of gathering potential mitigation evidence. *Porter*, 558 U.S. at 39 (internal quotation marks omitted). Barber's trial counsel relied almost entirely on Dr. Rosenzweig to conduct their mitigation investigation. Dr. Rosenzweig's investigation consisted of a two-hour interview with Barber and just over four hours conducting phone interviews with four collateral sources—Barber's mother, two of his brothers, and a former employer. (Vol. 25 at 182-83, 198-99, 207). Neither she nor trial counsel interviewed any additional sources concerning Barber's past, including Barber's extended family members, childhood friends, ex-girlfriends, ex-fiancé, or ex-wife. They also did not obtain or review any of Barber's school records, DUI arrest records, or records regarding his medical history, family history, or employment history. (Vol. 25 at 202-05).

The Supreme Court has found deficient performance under *Strickland* where counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. In *Wiggins*, counsel's mitigation investigation consisted of psychological testing and reviewing a presentence investigation report and social services records from the City of Baltimore. *Id.* at 523. The presentence investigation report contained only "a one-page account of Wiggins' 'personal history' noting his 'misery as a youth,' quoting his description of his own background as 'disgusting,' and observing that he spent most of his life in foster care." *Id.* (some internal quotation marks omitted). The social services records merely documented Wiggins' "various placements in the State's foster care system." *Id.*

The Court also found deficient performance in *Williams*. 529 U.S. at 395-96. There, counsel did not begin preparing a mitigation case until a week before trial and failed to obtain juvenile records that "graphically describ[ed] Williams' nightmarish childhood." *Id.* at 395 & n.19. Counsel also failed to (1) "introduce available evidence that Williams was 'borderline mentally retarded' and did not advance beyond sixth grade in school," (2) seek prison records describing positive behavior by Williams in prison, and (3) return the phone call of a witness who offered to testify about positive interactions he had with Williams as part of a prison ministry program. *Id.* at 396.

The Court found deficient performance again in *Porter* where counsel had only one short meeting with the defendant and "did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family." 558 U.S. at 39. Finally, the Court in *Sears* affirmed a state court's finding of deficient performance where counsel's investigation

consisted of one day or less spent interviewing roughly a dozen witnesses selected by the defendant's mother. 561 U.S. at 952; *id.* at 958 (Scalia, J., dissenting).

Given Barber's insistence that trial counsel pursue an absolute innocence defense at the guilt stage, counsel believed obtaining anything less than a capital murder conviction at the guilt phase was not "realistically achievable." (Vol. 24, Tab R-60 at 59). Counsel's objective heading into trial was therefore "[t]o put on a mitigation case and try to avoid the death penalty." (*Id.*). In light of that trial strategy and counsel's "obligation to conduct a thorough investigation of the defendant's background," *Porter*, 558 U.S. at 39 (internal quotation marks omitted), it is at least a close question whether trial counsel met that obligation with an investigation consisting of a two-hour interview with Barber; four hours interviewing Barber's mother, two brothers, and a former employer; and at best limited (and unsuccessful) attempts to review records concerning Barber's personal history. *See Johnson v. Sec'y, DOC*, 643 F.3d 907, 932 (11th Cir. 2011) (finding deficient performance where trial counsel recognized "that the sentence stage was the only part of the trial in which [the defendant] had any reasonable chance of success" but nevertheless "failed to adequately" prepare for the sentence stage). Whether the state court's contrary decision was unreasonable under the deferential standard of review imposed by § 2254(d) is an even closer question. But the court need not decide that issue because, in any event, the state court reasonably concluded that Barber failed to show prejudice. *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (en banc) ("[I]f we conclude that the [state court] reasonably applied clearly established federal law when it decided that [petitioner] had failed to establish prejudice, we may affirm the denial of [the habeas] petition without addressing whether the performance of his counsel was deficient.").

### b. Prejudice

The Court of Criminal Appeals concluded Barber was not prejudiced by his counsel's performance because he failed to show "what additional information or witnesses could have been provided that would have been so compelling it would have caused a different result at the penalty phase." (Vol. 29, Tab R-65 at 26). Based on the evidence presented at Barber's original penalty-phase trial and his Rule 32 hearing, that conclusion was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

To establish prejudice, Barber must show there was "a reasonable probability that, absent [counsel's deficient performance], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "[R]easonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. That standard "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 111-12. To determine whether Barber has shown a "reasonable probability" of a different outcome, the court must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (internal quotation marks and brackets omitted). The court begins by considering the mitigation evidence presented at the penalty phase of Barber's trial.

### i. Mitigation Evidence at Barber's Penalty-Phase Trial

Three witnesses testified at the penalty phase of Barber's trial. The court reviews the testimony of each, in turn.

Barber's older brother, Mark Barber, testified first. He described his and Barber's childhood as "a normal childhood" and stated that he had left home when Barber was about fifteen years old. (Vol. 12, Tab R-27 at 1216). Mark testified that Barber "always had a big heart" and did "whatever he could for anybody he could." (*Id.* at 1217). He explained that Barber began using marijuana and alcohol around age twelve or thirteen, "[p]ossibly younger than that," and continued to abuse these substances over his entire life. (*Id.*). Mark testified that on several occasions he tried to assist Barber with checking into a clinic to get help for his drug addiction and alcoholism, but was unsuccessful because Barber lacked insurance and could not pay for rehab. (*Id.* at 1217-18). He also testified that Barber was a painter who did good work, was well-liked by others, and had the ability to express love and good feelings to other people. (*Id.* at 1219-20).

Alex Dryer, a minister who came to know Barber through a prison ministry, testified next. (*Id.* at 1222). Dryer testified that Barber had become a Christian through the prison ministry and was an active participant in weekly praise and worship. (*Id.* at 1223). He also testified that Barber shared his faith with other inmates, leading others to become Christians as well. (*Id.* at 1223-24). Finally, Dryer testified that he believed Barber has the capacity to love and care for other people, and that he had seen major changes in Barber during the last two years of ministering to him. (*Id.* at 1224-25).

Dr. Rosenzweig testified last. After explaining her qualifications and investigative methods, Dr. Rosenzweig began by telling the jury what she had learned about Barber's childhood. (*Id.* at 1227-33). She testified that Barber was the fifth of seven children and grew up in a small Connecticut town with his parents, who had only been married to each other. (*Id.* at 1233). She stated that Barber had "a pleasant home life," and that "his parents were good

parents" even though seven children didn't "get as much individual attention." (*Id.*). With the exception of being teased by other kids for being overweight, Barber had "basically a happy childhood." (*Id.*). He made above-average grades in school and only got into minor trouble at home. (*Id.* at 1234). According to Dr. Rosenzweig, Barber's mother "described him as being a little bit mischievous, not a bad boy and he was not really much trouble." (*Id.*).

Dr. Rosenzweig next told the jury about Barber's adolescent years. She testified that Barber began using marijuana at age thirteen, which was "not atypical" in the small town he grew up in. (*Id.*). By age fifteen or sixteen, he had started using "any kind of pills that he could get his hands on," and by sixteen to seventeen, he was "smoking marijuana on a daily basis," both before and after school. (*Id.*). During his teenage years, Dr. Rosenzweig testified, Barber spent time with "a partying-type crowd" who used alcohol and drugs, but he only got into minor trouble for things like skipping school. (*Id.* at 1234-35). In the twelfth grade, against his parents' advice, Barber quit school and moved to Florida to work in the construction business with one of his older brothers. (*Id.* at 1235).

Dr. Rosenzweig then told the jury about Barber's adult life. Dr. Rosenzweig described Barber's employment history, including his time working construction in Florida, at a manufacturing plant in Connecticut, as a vacuum cleaner salesman and then branch manager, and as a painter. (*Id.* at 1235-36). She also described his romantic relationships, including a seven-year relationship with a live-in girlfriend, a two-year marriage, and his relationship with Liz Epps, the victim's daughter. (*Id.* at 1237-38, 1242). The first two relationships ended in part because of Barber's substance abuse, and Barber was arrested in 1998 for slapping Liz Epps in the face during an argument. (*Id.* at 1237-38).

Last, Dr. Rosenzweig told the jury about the significant impact Barber's substance abuse had on his life. Barber began using cocaine on a casual basis in his early twenties, which then escalated to heavy use. (*Id.* at 1238). At times he "went on binges where he might . . . stay high for about three, four days and not sleep much during that time." (*Id.*). From about 1985 to 1998, Dr. Rosenzweig testified, Barber had five different arrests for driving while intoxicated. (*Id.*). His drug use strained his relationships with family and friends, especially when he would borrow money to support his substance abuse and fail to repay it. (*Id.* at 1239). Barber's brother, Glenn, told Dr. Rosenzweig that Barber had stolen coins from him as well as a microwave and golf clubs to pawn for drug money. (*Id.* at 1240-41).

Barber enrolled in Alcoholics Anonymous and was able to stop using cocaine and alcohol for a brief period of time, from about 1999 to 2000. (*Id.* at 1242-43). But in October 2000, he injured his back and was prescribed pain pills for the injury. (*Id.* at 1243). He began abusing pain pills shortly after that and was using cocaine again by December 2000. (*Id.*). Barber's cocaine usage escalated from about fifty dollars' worth of cocaine per week in 2000 to three to four hundred dollars' worth per week at the time of Epps' death. (*Id.*). He also continued to heavily abuse alcohol during this time, consuming anywhere from a half to a full case of beer three to four times per week. (*Id.* at 1246).

Based on Barber's heavy substance abuse, Dr. Rosenzweig testified that he could be diagnosed with cocaine abuse, cocaine dependency, alcohol abuse, and possibly alcohol dependency, all of which are psychiatric diagnoses recognized by the fourth edition of the Diagnostic and Statistical Manual. (*Id.* at 1247-48). She explained the effects of cocaine use on human behavior, including its effect on the brain and its tendency to cause users to become

irritable, agitated, violent, and judgment-impaired. (*Id.* at 1248-56). And she testified specifically that she observed these types of cocaine-induced behaviors in Barber's case. (*Id.* at 1256).

Dr. Rosenzweig also testified that there was scientific evidence showing a hereditary or biological basis for alcohol and drug addiction in certain people and that Barber's family history suggested he may have been predisposed to substance abuse. (*Id.* at 1257). She pointed to Barber's strong family history of substance abuse, including an alcoholic maternal grandfather and multiple siblings who abused alcohol or marijuana during their lives. (*Id.*). Finally, Dr. Rosenzweig testified that she believed Barber would likely be a model prisoner who would pose no risk to other inmates or prison staff if he received a life sentence instead of the death penalty. (*Id.* at 1258-60).

### ii.      Mitigation Evidence at Barber's Rule 32 Hearing

As explained above, Barber points to three categories of mitigation evidence presented at his Rule 32 hearing that he claims were not presented at his original trial and would have created a reasonable probability of a different sentence had the jury heard them. Those three categories are (1) evidence regarding Barber's personal and family history of mental illness, (2) evidence that Barber had destructive role models during his childhood, and (3) evidence of a lack of parental discipline in the Barber home. The court reviews the Rule 32 hearing testimony regarding each of these categories in detail.

<u>Evidence of Mental Illness.</u> At his Rule 32 hearing, Barber's sister Beverly Risedorf testified that Barber's mother experienced two nervous breakdowns, one of which resulted in a prolonged catatonic state that caused her to be hospitalized and lose about 60 pounds. (Vol. 25 at 342-45). She also testified that Barber's grandmother experienced several nervous breakdowns that confined her to bed and required shock treatments. (Vol. 25 at 336-38). Barber's niece

Denise Kisiel testified that her mother Penny Kittredge (Barber's older sister) was hospitalized for mental health issues relating to prolonged depression. (Vol. 25 at 291, 303-05). Risedorf further testified that Barber himself contemplated suicide on at least one occasion—Barber's mother had come home from work and "found [Barber] in the room with a gun in his mouth." (Vol. 25 at 350). Both Risedorf and Kisiel stated they would have been willing to testify at Barber's trial in 2003. (Vol. 25 at 306, 364-65). Dr. William Alexander Morton, Jr., a psychopharmacologist who testified at the Rule 32 hearing, stated that mental illnesses have a hereditary basis and often run in families. (Vol. 26 at 452, 568).

Evidence of Poor Role Models. Risedorf testified that Ron Kittredge, her and Barber's older brother-in-law, lived in the Barber household for some time after he was released from prison. (Vol. 25 at 338-340). She recounted one occasion on which Ron Kittredge smashed the mirror over her sister's bedroom dresser, cutting himself. (Vol. 25 at 340-41). She also testified that Ron Kittredge was sometimes intoxicated in front of Barber. (Vol. 25 at 342). Mark Barber described Ron Kittredge as "a bad influence, in trouble all the time and, you know, I'm sure on drugs and alcohol and whatever." (Vol. 25 at 314). Mark similarly testified that his and Barber's older brother, Joel, was an alcoholic who was "a bad influence" on Barber. (Vol. 25 at 314). He testified further that numerous members of Barber's immediate family used drugs growing up— "[p]retty much everybody at some point or another" "except for my two younger brothers." (Vol. 25 at 315).

Evidence of a Lack of Parental Discipline. Denise Kisiel testified that she could recall "some fights that [Barber] may have had with his siblings" when she visited the Barber home as a child and that she could not remember Barber ever specifically being punished for those incidents. (Vol. 25 at 295). Francis King, a high school friend of Barber's, testified that Barber

used drugs and alcohol on a daily basis during parts of his teenage years. (Vol. 25 at 281). He also testified that Barber was suspected of stealing money from his father's gas station where he worked part-time but that Barber's father would only give him "a scolding" instead of meaningful "disciplinary action." (Vol. 25 at 282-83). King, who described himself as a "pretty regular visitor" to the Barber residence, stated that he observed "no disciplinary action there as compared to what I grew up with." (Vol. 25 at 284). Mark Barber testified that there was little discipline in the Barber household when he and Barber were growing up, describing the environment as "very lenient." (Vol. 25 at 311-12). He explained that "[i]t was difficult . . . for my parents to discipline seven children. My Dad was . . . ususally working somewhere around the clock . . . ." (Vol. 25 at 311). "[B]y the time you were a 12-year-old child in our family," he testified, "you were pretty much on your own. You could do pretty much anything in those days." (Vol. 25 at 312). Barber contends the lack of discipline by his parents led him "to develop his own perverse view of moral norms and consequences" and "resulted in [him] engaging in more frequent poor and sometimes violent behaviors." (Doc. # 23 at 72).

### iii.      Reweighing the Mitigation Evidence

Barber has not shown that the additional mitigation evidence presented at his Rule 32 hearing would have created a reasonable probability of a different outcome at his penalty-phase trial, and he certainly has not shown that the state court was unreasonable for failing to conclude otherwise. The state court's conclusion that Barber failed to establish prejudice was reasonable for at least three different reasons.

First, some of the allegedly "new" mitigation evidence presented at Barber's Rule 32 hearing was in fact cumulative of the mitigation evidence offered at his penalty-phase trial. The jury at Barber's trial heard testimony from Dr. Rosenzweig that Barber had grown up around

poor role models in an environment where drug and alcohol use was common. She explained that Barber had begun using marijuana at age thirteen, which was "not atypical" in the town where he grew up. (Vol. 12, Tab R-27 at 1234). She also testified that Barber spent time with "a partying-type crowd" who used alcohol and drugs, and that he regularly abused alcohol and drugs himself during his teenage years. (*Id.* at 1234-35). Thus, the Rule 32 hearing testimony indicating that Barber's older brother Joel and brother-in-law Ron Kittredge were bad influences who used drugs or alcohol around Barber would have added little to what the jury already knew from Dr. Rosenzweig about Barber's younger years. And, as the Eleventh Circuit has explained, a finding of no prejudice is entirely appropriate where "the petitioner's postconviction mitigation evidence is cumulative of the mitigating evidence the jury already knew about." *Evans*, 703 F.3d at 1342; *see also id.* n.4 (collecting cases applying this principle).

Second, the postconviction mitigation evidence Barber presented was nowhere near as compelling as the new mitigation evidence offered in cases in which the Supreme Court has found prejudice. On de novo review, the Supreme Court has found prejudice where new mitigation evidence showed that a petitioner with diminished mental capacities had "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother"; "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care"; and been homeless for a time. *Wiggins*, 539 U.S. at 535. The Court also found prejudice on de novo review in *Rompilla* based on the following mitigation evidence presented at Rompilla's postconviction hearing:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat

him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

545 U.S. at 391-92 (internal quotation marks omitted).

On § 2254(d) review, the Supreme Court has found prejudice where new mitigation evidence "graphically describe[ed]" the petitioner's "nightmarish childhood" -- including being severely and repeatedly beaten by his father, living in a home with standing feces and urine, and being placed in an abusive foster home while his parents were incarcerated -- and showed that the petitioner was "borderline mentally retarded and did not advance beyond sixth grade in school." *Williams*, 529 U.S. at 395-96 & n.19 (internal quotation marks omitted). It also found prejudice under § 2254(d) in *Porter*, where postconviction mitigation evidence revealed "(1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." 558 U.S. at 41.[9]

The new mitigation evidence offered at Barber's Rule 32 hearing -- testimony that Barber's mother and grandmother experienced nervous breakdowns, his sister suffered from depression, Barber had poor role models growing up, and the Barber household was undisciplined -- is simply not comparable to the graphic, gripping postconviction mitigation

_____

[9] The specific mitigation evidence introduced at Porter's postconviction hearing included testimony that "Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child"; that "[o]n one occasion, Porter's father shot at him for coming home late, but missed and just beat Porter instead"; that "Porter attended classes for slow learners and left school when he was 12 or 13"; and that Porter suffered from posttraumatic stress disorder as a result of serving his country in the Korean War, where he fought and was wounded in some of the worst battles of the war. *Porter*, 558 U.S. at 33-35 & n.4.

evidence offered in *Wiggins*, *Rompilla*, *Williams*, and *Porter*. Far from experiencing violent and abusive parents, physical and sexual abuse, extreme neglect, and frequent changes in custody or homelessness, Barber's Rule 32 hearing expert explained that Barber came from an intact family, did not experience sexual or physical abuse, and always had adequate food, shelter, and clothing. (Vol. 27 at 587-88). And unlike the petitioners in *Wiggins* and *Williams*, who had diminished mental capacities or were borderline mentally retarded, Barber's Rule 32 hearing expert testified that Barber did not have deficient intellectual abilities. (*Id.* at 588). In light of the stark differences between the postconviction mitigation evidence presented in Barber's case and in cases in which the Supreme Court has found prejudice, the court cannot say that the state court acted contrary to or unreasonably applied clearly established Supreme Court precedent in finding that Barber failed to establish prejudice.

Third, the state court's decision that Barber failed to show prejudice was reasonable in light of *Cullen v. Pinholster*, 563 U.S. 170, 201-02 (2011). There, the petitioner offered additional mitigation evidence quite similar to the evidence presently offered by Barber in an attempt to show prejudice under *Strickland*. In particular, Pinholster presented evidence of his family's "serious substance abuse, mental illness, and criminal problems." *Pinholster*, 563 U.S. at 201. But the Court concluded that evidence was "by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation." *Id.* The same could be said of Barber's postconviction mitigation evidence concerning his family members' substance abuse, mental illness, and criminal histories.

In *Pinholster* the petitioner also offered evidence that (1) his brother "died of suicide by drug overdose," (2) he "was mostly unsupervised and 'didn't get much love,' because his mother and stepfather were always working and 'were more concerned with their own lives than the

welfare of their kids,'" and (3) "[n]either parent seemed concerned about Pinholster's schooling." *Id.* at 201-02. The Court nevertheless concluded that this additional evidence was insufficient to render the state court's conclusion that Pinholster failed to show prejudice unreasonable. *Id.* at 202. Likewise, this court cannot say the Alabama Court of Criminal Appeals was unreasonable to conclude that the additional evidence of Barber's family history of mental illness, poor childhood role models, and lack of parental discipline and supervision would not have created a reasonable probability of a different result if presented at Barber's penalty-phase trial.

For all these reasons, Barber is not entitled to habeas relief on his penalty-phase ineffective assistance claim.

### C. Barber's Claims That the Trial Court Improperly Precluded the Jury from Considering Certain Mitigation Evidence and Failed to Instruct the Jury Regarding Mercy

At the penalty phase of Barber's trial, the jury heard testimony from Barber's family and friends about their love for him and desire to see him live. In addition to offering mitigation evidence, Barber's mother, Elizabeth Barber, and his spiritual advisor, Alex Dryer, both expressed how much they cared about Barber and that they wanted him to live. (Vol. 12, Tab R-27 at 1224-25, 1275). Barber's mother pleaded with the jury to spare Barber's life because of her love for him. (*Id.* at 1275). At the close of the penalty-phase testimony, the trial court told the jury that "the defendant's family's wishes as to what the sentence should be or what the sentence should not be are not factors that you can consider in arriving at your verdict." (*Id.* at 1278). The trial court also gave the following penalty-phase instruction before the jury retired to deliberate:

> You also heard statements from family of the Defendant asking that you not determine that death would be an appropriate penalty. And while they have the right to make that request, that in and of itself, requests of that type are not offered as mitigation in this case but can be taken as far as the life of the Defendant in that

regard and what he has done in the past prior to the crime being committed and since his incarceration.

(*Id.*, Tab R-31 at 1317-18).

Barber claims two constitutional violations based on the trial court's jury instructions. (Doc. # 1 at 119-26). First, he argues the trial court's instructions limiting the consideration the jury could give the testimony of his family and friends violated his Eighth and Fourteenth Amendment rights. (Doc. # 23 at 96-98). Second, Barber argues the trial court's failure to expressly instruct the jury that it could consider mercy in determining his sentence violated his Eighth and Fourteenth Amendment rights. (*Id.* at 99-101). The Alabama Court of Criminal Appeals addressed and rejected both claims on Barber's direct appeal. *Barber*, 952 So. 2d at 447-53. As explained below, neither determination by the state court was unreasonable, and Barber is therefore not entitled to habeas relief on these claims.

### 1. The Trial Court's Instructions Regarding the Testimony of Barber's Family and Friends

Barber argues that under the Eighth and Fourteenth Amendments, he "was entitled to full recognition and consideration of all relevant factors mitigating in favor of life without parole instead of death, including his family's and friends' desire to see him live." (Doc. # 23 at 96). He claims the trial court's instruction that the jury disregard "the defendant's family's wishes as to what the sentence should be or what the sentence should not be" violated that guarantee. (Vol. 12, Tab R-27 at 1278). The Alabama Court of Criminal Appeals rejected Barber's claim on direct appeal. It concluded that that "the opinions of [Alex] Dryer and [Elizabeth] Barber about punishment were not relevant mitigating circumstances for the jury to consider during the penalty phase of [Barber's] capital trial" and that the trial court therefore "did not improperly restrict the jury's consideration of those opinions by giving" the above-quoted instructions. *Barber*, 952 So. 2d at 450.

Barber claims the state court's decision was unreasonable in light of *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); and *Woodson v. North Carolina*, 428 U.S. 280 (1976). (Docs. # 1 at 122-23; 23 at 97).[10] Those decisions do espouse the principle that sentencing juries may not "be precluded from considering any relevant mitigating evidence" in deciding whether to impose the death penalty on a particular individual. *Hitchcock*, 481 U.S. at 394 (internal quotation marks omitted). But they *do not* hold that the desire of a defendant's friends and family to see him live qualifies as "relevant mitigating evidence" that the Constitution requires sentencing juries be permitted to consider. *Id.* Instead, the decisions Barber cites merely require that sentencers in capital cases be allowed to consider such traditional mitigating evidence as a defendant's life experiences, family history, character traits, mental and emotional profile, prior record, and role in the crime at issue.[11]

It is no surprise that the decisions Barber cites do not require sentencers to treat the views of a defendant's family and friends concerning the appropriate sentence as "relevant mitigating evidence." "Mitigating evidence," as its name suggests, refers to evidence that the American

_____

[10] Barber also cites *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007), (Doc. # 23 at 97), but that case was decided after Barber's direct appeal. It therefore does not represent clearly established law at the time of the relevant state-court decision. *See Pinholster*, 563 U.S. at 182.

[11] *Penry* held that it was unconstitutional to execute a defendant where the sentencing jury "was never instructed that it could consider [evidence of the defendant's mental retardation and history of abuse] as *mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence." 492 U.S. at 320; *see also id.* at 328. *Hitchcock* reached the same conclusion where the trial judge instructed the sentencing jury not to consider nonstatutory mitigating evidence concerning the defendant's difficult childhood, tumultuous upbringing, and positive character traits. 481 U.S. at 397-99. *Eddings* also set aside a defendant's death sentence because the sentencing judge refused to consider as mitigating evidence the sixteen-year-old defendant's troubled family history, difficult upbringing, and emotional disturbance. 455 U.S. at 107-09, 112-17. In *Lockett*, a plurality of the Court likewise concluded that the defendant's death sentence was unconstitutionally obtained where the state's death penalty statute did not permit the sentencing judge to consider such mitigating factors as the defendant's character, prior record, age, lack of specific intent to cause death, and relatively minor role in the crime. 438 U.S. at 597. Finally, *Woodson* invalidated North Carolina's mandatory death-penalty statute in part because it failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition" of the death penalty. 428 U.S. at 303.

legal tradition has long held to be relevant to an offender's moral culpability. *See Penry*, 492 U.S. at 319 (explaining that "evidence about the defendant's background and character is relevant" to determining the appropriateness of the death penalty "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse") (internal quotation marks omitted). It is difficult to see how the desires of a defendant's family and friends concerning whether he lives or dies, standing alone, bear on his moral culpability for the crime at issue. This may explain why the Supreme Court has never recognized a constitutional requirement for capital sentencers to consider the desires of a defendant's family and friends when imposing sentence.

Given the factual distinctions between the traditional mitigating *evidence* at issue in the Supreme Court decisions Barber cites and the testimony about his family's and friends' *desires* in this case, it is plain that the state court's decision was not "contrary to" clearly established Supreme Court precedent. *See Jones*, 753 F.3d at 1182. And, given the questionable relevance of the desires of a defendant's family and friends concerning his sentence to determining his moral culpability, *see Penry*, 492 U.S. at 319, this court cannot say the state court unreasonably applied Supreme Court precedent by declining to extend it to a new context where it arguably should not apply. Accordingly, Barber is not entitled to habeas relief on this claim.

### 2. The Trial Court's Failure to Give an Instruction Regarding Mercy

Barber also challenges the state trial court's failure to give several penalty-phase jury instructions he requested relating to mercy. Barber requested multiple penalty-phase jury instructions that referenced the concept of mercy. (Vol. 2 at 223-34, ¶¶ 10, 29-30, 32, 37, 39-43). The most explicit proposed jury instructions read as follows:

39. This court's prior instruction, during the trial phase, that you were not to be swayed by mercy in deciding whether the defendant was guilty, does not apply in this sentencing hearing. You may decide to sentence the defendant to life imprisonment without the possibility of parole simply because, based on the evidence introduced at either the guilt-innocence or sentencing phase at this trial, you find it appropriate to exercise mercy.

40. A decision to grant the defendant mercy based on the evidence introduced at either the guilt-innocence or sentencing phase at this trial does not violate the law. The law does not forbid you from being influenced by pity for the defendant and you may be governed by mercy, sentiment, or sympathy for the defendant in arriving at a proper penalty in this case as long as that pity, mercy, sentiment or sympathy is derived from the evidence.

41. If a mitigating circumstance or an aspect of the defendant's background or character, based upon the evidence you have heard or seen at either the guilt-innocence or sentencing phase of this trial, arouses mercy, sympathy, empathy, or compassion that persuades you that death is not the appropriate penalty, you must act in response and impose a sentence of life imprisonment.

. . . .

43. An appeal to the sympathy or passions of a jury is inappropriate at the guilt phase of a trial. However, at the penalty phase, you may consider sympathy, pity, compassion, or mercy for the defendant that has been raised by any evidence that you have heard or seen. . . . You may decide that the sentence of life imprisonment without the possibility of parole is appropriate for the defendant based on the sympathy, pity, compassion, and mercy you feel as a result of the evidence introduced at either the guilt-innocence or the penalty phase.

(*Id.* at 231, ¶¶ 39-43).

The trial court denied Barber's request for the above-quoted instructions, and did not explicitly instruct the jury that it could consider mercy in determining Barber's sentence. (Vol. 12, Tab R-31 at 1306-26). Instead, the trial court gave the following general instruction to the jury: "mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the Defendant offers as a basis for a sentence of life imprisonment without parole as opposed to death and *any other relevant mitigating circumstance* which the Defendant offers as a basis for a sentence of life imprisonment without parole instead

of death." (*Id.* at 1316-17). In other words, though the trial court did not explicitly instruct the jury that it could consider mercy in determining Barber's sentence, it did not forbid them from considering mercy either. Additionally, the trial court also did not forbid defense counsel or defense mitigation witnesses from asking for mercy on behalf of Barber, and both defense counsel and mitigation witnesses did in fact plead for mercy before the sentencing jury. (*Id.*, Tab R-27 at 1224-25, 1275; Tab R-29 at 1298).

On direct appeal, the Alabama Court of Criminal Appeals rejected Barber's constitutional challenge to the trial court's decision not to give his requested jury instructions regarding mercy. The court concluded "that the trial court properly refused to give [Barber's] requested instructions or any other instructions relating to mercy." *Barber*, 952 So. 2d at 453. For the reasons explained below, the state court's decision was not unreasonable.

Barber argues the trial court had a "constitutional obligation to instruct the jury clearly and specifically that sympathy or mercy can form the basis for a life sentence" and that the trial court's failure to do so violated clearly established Supreme Court precedent. (Doc. # 1 at 127, ¶ 259; *see also* Doc. # 23 at 99-101). But none of the cases Barber cites in support of this argument[12] hold that a death sentence must be set aside as unconstitutional if the trial judge does not explicitly instruct the sentencing jury that it may consider mercy in determining the appropriate sentence. At most, some of those cases stand for the general proposition that a trial judge is required by the Eighth and Fourteenth Amendments to "clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death." *Moore*, 809 F.2d at 731 (internal quotation marks omitted) (collecting cases). The trial judge in Barber's case

---

[12] *Simmons v. South Carolina*, 512 U.S. 154 (1994); *Mills v. Maryland*, 486 U.S. 367 (1988); *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Nelson v. Nagle*, 995 F.2d 1549 (11th Cir. 1993); *Moore v. Kemp*, 809 F.2d 702, 730 (11th Cir. 1987); *Peek v. Kemp*, 784 F.2d 1479 (11th Cir. 1986); *Miller v. Estelle*, 677 F.2d 1080 (5th Cir. 1982); and *Spivey v. Zant*, 661 F.2d 464 (5th Cir. 1981). *See* (Docs. # 1 at 127-28; 23 at 99-101).

doubtless complied with that requirement by spending six full trial-transcript pages explaining various types of mitigation evidence to the jury (Vol. 12, Tab R-31 at 1313-18) and expressly instructing the jury, "If you determine . . . that one or more aggravating circumstances exists but that they do not outweigh the mitigating circumstances you find exist[ ], then . . . your determination would be life without parole." (*Id.* at 1320). No decision Barber cites, of the Supreme Court or otherwise, clearly establishes a constitutional rule requiring trial judges in capital cases to explicitly instruct the sentencing jury that it may consider mercy in determining the appropriate sentence. Therefore, the state court's decision rejecting this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, and Barber is not entitled to habeas relief on this claim.

### D.     Barber's *Ring v. Arizona* Claim

In *Ring v. Arizona*, 536 U.S. 584, 609 (2002) the Supreme Court held that the Sixth Amendment's jury-trial guarantee requires a jury, not a judge, to find beyond a reasonable doubt every fact that makes a defendant death-eligible. Barber claims his death sentence was obtained in violation of *Ring* and that the Alabama Court of Criminal Appeals unreasonably rejected his *Ring* claim on direct appeal. (Doc. # 1 at 130-37). The court disagrees. The state court's decision affirming Barber's death sentence was neither contrary to nor an unreasonable application of *Ring*, and he is therefore not entitled to habeas relief on this claim.

#### 1.   Relevant Supreme Court Precedent

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, guarantees criminal defendants the right to a trial "by an impartial jury." That right, "in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 104 (2013). In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that any fact (other than the

fact of a prior conviction[13]) that increases the maximum penalty that may be imposed upon a defendant constitutes an element of the crime and must therefore be proved to a jury beyond a reasonable doubt.

Two years later in *Ring*, the Court extended *Apprendi* to the context of capital sentencing. *Ring* considered the constitutionality of Arizona's capital sentencing scheme. Under Arizona law, a defendant convicted of first-degree murder could not receive a death sentence absent a factual determination that a statutory aggravating factor existed. *Ring*, 536 U.S. at 596. Put differently, without a factual determination that an aggravating factor existed, the maximum penalty a defendant convicted of first-degree murder could receive was life in prison. *Id.* at 596-97. The constitutional problem with Arizona's capital sentencing scheme, the Court held, was that Arizona law required the sentencing judge, and not a jury, to make the critical finding whether an aggravating factor existed. *Id.* at 597, 609. Thus, under *Ring*, the Sixth Amendment requires every fact that makes a defendant eligible for the death penalty -- that makes the maximum imposable sentence death -- to be found by a jury beyond a reasonable doubt.

The Supreme Court recently applied *Ring* to hold Florida's capital sentencing scheme unconstitutional in *Hurst v. Florida*, 136 S. Ct. 616 (2016).[14] Under Florida law, the maximum sentence a defendant convicted of first-degree murder could receive on the basis of his conviction alone was life imprisonment. *Id.* at 620. A person convicted of first-degree murder could be sentenced to death "only if an additional sentencing proceeding result[ed] in findings by the court that such person shall be punished by death." *Id.* (internal quotation marks omitted). The additional sentencing proceeding called for under Florida law required the sentencing judge

---

[13] *See Almendarez-Torres v. United States*, 523 U.S. 224, 239-47 (1998).

[14] Because *Hurst* had not been decided at the time of Barber's direct appeal, the court discusses *Hurst* "only to the extent it reflects an application and explication of the Supreme Court's holding in *Ring*." *Waldrop v. Comm'r, Alabama Dep't of Corr.*, 711 F. App'x 900, 923 n.6 (11th Cir. 2017).

to conduct an evidentiary hearing before a jury. *Id.* The jury would then return "an 'advisory sentence' of life or death without specifying the factual basis of its recommendation." *Id.* Finally, the sentencing judge, "[n]otwithstanding the recommendation" of the jury, was to independently weigh the aggravating and mitigating circumstances and enter a sentence of life imprisonment or death. *Id.* (internal quotation marks omitted). Though Florida law required the sentencing judge to "give the jury recommendation great weight," the sentence was required to "reflect the trial judge's independent judgment about the existence of aggravating and mitigating factors." *Id.* (internal quotation marks omitted).

The jury at Hurst's guilt-phase trial convicted him of first-degree murder, but it did not specify which of two theories charged by the trial judge it believed: premeditated murder or felony murder for an unlawful killing during a robbery. *Id.* at 619-20. At Hurst's sentencing hearing, the jury recommended the death penalty by a vote of seven to five, but it did not specify which of two aggravating factors charged by the sentencing judge it had found beyond a reasonable doubt: "that the murder was especially 'heinous, atrocious, or cruel' or that it occurred while Hurst was committing a robbery." *Id.* at 620.

The Supreme Court held that Hurst's sentence violated the Sixth Amendment rule announced in *Ring* because "the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole." *Id.* at 622. It therefore reversed the Florida Supreme Court's judgment affirming Hurst's death sentence. *Id.* at 624.

### 2. Alabama's Capital Sentencing Scheme and Barber's Death Sentence

Like Florida, Alabama also bifurcates the guilt and penalty phases of a capital defendant's trial. *See* Ala. Code § 13A-5-45. After a defendant is convicted of a capital offense, the trial court is required to "conduct a separate sentence hearing to determine whether the defendant shall be sentenced to life imprisonment without parole or to death." Ala. Code § 13A-

5-45(a). A capital defendant may not be sentenced to death "[u]nless at least one aggravating circumstance as defined in Section 13A-5-49 exists." *Id.* § 13A-5-45(f). Certain capital offenses, like the murder during a robbery Barber was convicted of, have as one of their elements a fact that corresponds to one of the aggravating circumstances listed in § 13A-5-49. *Compare* Ala. Code § 13A-5-40(a)(2) (defining the capital offense of murder committed during a robbery), *with* Ala. Code § 13A-5-49(4) (listing as an aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged . . . in the commission of . . . robbery"). Where such overlap between the elements of a capital offense and the aggravating circumstance necessary to impose a death sentence exists, Alabama law provides that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." Ala. Code § 13A-5-45(e).

At the time of Barber's conviction and sentencing, Alabama law required the penalty-phase jury to "hear the evidence and arguments of both parties, deliberate, and return an advisory verdict recommending either life imprisonment without parole (if it determined that no aggravating circumstances existed, or that the aggravating circumstances did not outweigh the mitigating circumstances) or death (if it determined that one or more aggravating circumstances existed, and that they outweighed the mitigating circumstances)." *Waldrop v. Comm'r, Alabama Dep't of Corr.*, 711 F. App'x 900, 922 (11th Cir. 2017) (citing the pre-2017 version of Ala. Code § 13A-5-46(e)). After receiving the jury's advisory verdict, the trial judge would then "independently determine the appropriate sentence." *Id.* (citing the pre-2017 version of Ala. Code § 13A-5-47(a)). "If the court found that at least one aggravating circumstance existed, and that they outweighed any mitigating circumstances, it could impose a death sentence,

notwithstanding a contrary jury recommendation." *Id.*; *see also* Ala. Code § 13A-5-47(e) (pre-2017 version).[15]

In Barber's case, the jury returned a unanimous guilt-phase verdict convicting Barber of murder during a first-degree robbery under Ala. Code § 13A-5-40(a)(2). (Vol. 11 at 1189; Vol. 1, Tab R-1 at 8-9). At the penalty phase, the trial judge instructed the jury that its guilt-phase verdict established the aggravating circumstance that Barber had killed Epps during a robbery beyond a reasonable doubt, and that it should consider the circumstance proven for purposes of sentencing. (Vol. 12, Tab R-31 at 1309-10). The state also argued it had established the existence of another aggravating circumstance—that the murder was especially heinous, atrocious, or cruel compared to other capital offenses. (*Id.* at 1310). The jury returned an advisory verdict recommending by a vote of eleven to one that Barber be sentenced to death. (*Id.*, Tab R-32 at 1330). The trial judge independently found the existence of both aggravating circumstances—that the murder occurred during a robbery and that the murder was especially heinous, atrocious, or cruel. (*Id.*, Tab R-33 at 1357; Tab R-35 at 273). The court then weighed the aggravating circumstances against the mitigating factors and sentenced Barber to death. (*Id.*, Tab R-33 at 1360-61; Tab R-34 at 1361; Tab R-35 at 276).

### 3. The State Court's Rejection of Barber's Claim Was Reasonable

Barber argued on direct appeal that his death sentence violated the Sixth Amendment rule announced in *Ring v. Arizona*. The Alabama Court of Criminal Appeals rejected his argument. "Because the [guilt-phase] jury convicted [Barber] of the capital offense of robbery-murder," the court reasoned, the aggravating circumstance of robbery *was* found by a jury "beyond a

---

[15] In 2017, Alabama amended its capital sentencing scheme. *See* S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017). Under the new scheme, the jury's sentence recommendation is binding on the court. *See* § 13-A-5-47(a) (2017) ("Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole.").

reasonable doubt." *Barber*, 952 So. 2d at 459. Thus, the court concluded, "the jury, and not the judge, determined the existence of the 'aggravating circumstance necessary for imposition of the death penalty.'" *Id.* (quoting *Ring*, 536 U.S. at 609).

The state court's decision was neither contrary to nor an unreasonable application of *Ring*. Barber became death-eligible under Alabama law when the guilt-phase jury convicted him of murder during a robbery in the first degree. That is so because Alabama law makes the death penalty available in a capital case whenever "at least one aggravating circumstance" exists. Ala. Code § 13A-5-45(f). That a murder occurred during a robbery is an aggravating circumstance, *id.*, § 13A-5-49(4), and that aggravating circumstance was found beyond a reasonable doubt when the jury convicted Barber of murder during a first-degree robbery at the guilt phase of his trial, *see id.*, § 13A-5-40(a)(2). Thus, every fact that made Barber eligible for the death penalty -- that made his maximum imposable sentence death -- was found by a jury beyond a reasonable doubt at the guilt phase of his trial. That is precisely what *Ring* requires.

Barber contends that *Ring* requires more. In addition to a guilt-phase jury finding of a statutory aggravating circumstance, Barber argues *Ring* requires the jury (and not the judge) to find that the aggravating circumstance(s) outweigh any mitigating circumstances. In other words, Barber claims he was not death-eligible for purposes of *Ring* absent a determination that the aggravating factors outweighed the mitigating factors, and that *Ring* therefore requires a jury to make that determination.

The Alabama Court of Criminal Appeals rejected Barber's argument on this point, and this court cannot say that its application of *Ring* "was so unreasonable that no 'fairminded jurist' could agree with the conclusion." *Waldrop*, 711 F. App'x at 923 (citing *Richter*, 562 U.S. at 101). *Ring* can be fairly read to require a jury finding on any fact that makes a defendant's

maximum imposable sentence death while still permitting a judge to make the ultimate decision, based on its weighing of aggravating and mitigating circumstances, whether to impose the maximum penalty of death or a lesser penalty. Indeed, that was Justice Scalia's explanation of *Ring*'s holding in his concurring opinion:

> What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those [s]tates that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring*, 536 U.S. at 612-13 (Scalia, J., concurring). And as the Eleventh Circuit has explained, that reading of *Ring* is also consistent with *Hurst*, which held that "the Sixth Amendment does not allow the trial court 'to find an aggravating circumstance, *independent of a jury's factfinding*, that is necessary for imposition of the death penalty.'" *Waldrop*, 711 F. App'x at 924 (quoting *Hurst*, 136 S.Ct. at 624) (emphasis in Eleventh Circuit's opinion).

Barber's argument that *Ring* requires a jury to determine whether aggravating factors outweigh mitigating factors before the death penalty may be imposed is also foreclosed by binding Eleventh Circuit precedent. *See Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1197-98 (11th Cir. 2013). In *Lee*, as here, an Alabama jury found the existence of an aggravating circumstance when it convicted the defendant of murder during a first-degree robbery. The Eleventh Circuit held that "[n]othing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict" to impose a death sentence. *Id.* at 1198. The court also held that "*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances." *Id.* And, as the Eleventh Circuit recently explained in an unpublished opinion, the fact that the trial judge (as in Barber's case) also independently found an additional aggravating circumstance not implicit in the guilt-

phase jury verdict (that the crime was especially heinous, atrocious, or cruel) is immaterial because "[t]he trial court's finding of an additional aggravating circumstance did not increase the maximum penalty to which [the defendant] was exposed, and therefore falls outside the clearly established holding in *Ring*." *Waldrop*, 711 F. App'x at 924. For all these reasons, Barber is not entitled to habeas relief on his *Ring v. Arizona* claim.

### E. Barber's Claim That His Indictment Was Defective

Barber argues that under *Apprendi* and *Ring*, aggravating circumstances which expose a defendant to the death penalty "are necessarily elements of the offense which must be specified in the indictment." (Doc. # 1 at 137, ¶ 279). He claims his indictment failed to identify the aggravating circumstances on which his death sentence was based and that he is therefore entitled to habeas relief. The Alabama Court of Criminal Appeals rejected this claim on direct appeal. It concluded that "although *Apprendi* required that the facts that increased a sentence above the statutory maximum must be submitted to a jury, those facts [do] not have to be alleged in the indictment." *Barber*, 952 So. 2d at 460 (internal quotation marks omitted).

The state court's conclusion was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. The only Supreme Court case Barber cites in support of this claim is *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). (Doc. # 1 at 137, ¶ 279). But *Jones* did not hold that the Constitution requires every fact that increases the maximum penalty for a crime to be charged in the indictment. Indeed, footnote six of the opinion, which Barber cites, explains that the Supreme Court's prior decisions merely "suggest rather than establish" that principle. *Jones*, 526 U.S. at 243 n.6. In fact, the *Jones* Court invoked the principle only to establish constitutional *doubt* concerning the Government's reading of the statute at issue in that case. *Id.* Because the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" in § 2254(d) "refers to the holdings, as

opposed to the dicta" of Supreme Court decisions, *Jones* does not provide Barber a basis for federal habeas relief. *Williams*, 529 U.S. at 412.

Moreover, the Supreme Court in *Apprendi* expressly reserved the question of whether the federal Constitution requires states to allege all facts that increase a defendant's sentencing exposure in an indictment. *See* 530 U.S. at 477 n.3. The Court noted that "Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment." *Id.* It therefore declined to "address the indictment question separately today," noting that "the Fifth Amendment right to 'presentment or indictment of a Grand Jury'" had never been incorporated through the Fourteenth Amendment and applied to the states. *Id.* In the years since *Apprendi*, the Supreme Court has never held that the federal Constitution requires states to charge every element of a crime in the indictment. It has only held that facts which increase a defendant's sentencing exposure must be proved to a jury beyond a reasonable doubt. As explained above, the State of Alabama satisfied that requirement in this case.

Finally, the court also notes, as a factual matter, that Barber's indictment *did* charge the aggravating circumstance that he intentionally killed Epps while committing a robbery. (Vol. 1, Tab R-1 at 9) ("[S]aid defendant caused said death during the time that the said defendant was in the course of committing or attempting to commit a theft of the following property, to-wit: One (1) purse containing lawful currency of the United States . . . and credit cards . . . by the use of force against the person of Dorothy Epps . . . ."). As noted above, Alabama law makes the death penalty available in a capital case whenever "at least one aggravating circumstance" exists. Ala. Code § 13A-5-45(f). Thus, even if *Jones* or another Supreme Court case had held that the Constitution requires every fact that increases the maximum penalty for a crime to be charged in

a state indictment (and, to be clear, the Supreme Court has never so held), Alabama would have complied with such a rule in this case.

> **F.** **Barber's Claims Based on the State Court's Reliance on *Ex Parte Waldrop*, 859 So. 2d 1181 (Ala. 2002) in Affirming His Death Sentence**

Barber argues that the Alabama Court of Criminal Appeals' reliance on *Ex Parte Waldrop*, 859 So. 2d 1181 (Ala. 2002) in affirming Barber's death sentence violated his rights under the Fourteenth Amendment's Due Process Clause and the Eighth Amendment. (Doc. # 1 at 137-39). In *Waldrop*, the Alabama Supreme Court held that the death penalty could be constitutionally imposed by a judge based on a guilt-phase jury finding that a statutory aggravating circumstance existed. 859 So. 2d at 1187-90. In that case, an Alabama jury convicted Waldrop of two counts of murder made capital because the murder was committed during a first-degree robbery and one count of murder made capital because two or more persons were murdered during a single course of conduct. *Id.* at 1185. At the conclusion of Waldrop's sentencing proceeding, the jury recommended by a vote of ten to two that Waldrop be sentenced to life imprisonment without parole. *Id.* The trial judge, however, overrode the jury's recommendation and sentenced Waldrop to death. *Id.* The Alabama Supreme Court held that Waldrop's death sentence did not violate *Ring* or *Apprendi* because Waldrop became death eligible upon the jury's guilt-phase finding that he committed murder during a first-degree robbery. *Id.* at 1187-88. The court explained that "the findings reflected in the jury's [guilt-phase] verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty." *Id.* at 1188. Once that event occurred, the court concluded, there was no constitutional problem with a judge choosing to impose the maximum penalty authorized by the jury's guilt-phase verdict -- death -- notwithstanding the jury's penalty-phase recommendation to the contrary. *Id.*

Barber contends the Alabama Court of Criminal Appeals' reliance on *Waldrop* in affirming his death sentence unconstitutionally changed the legal effect the jury's guilt-phase verdict. Barber argues that *Waldrop* "arbitrarily renders defendants convicted of some capital offenses automatically subject to the death penalty at the end of the guilt phase, while defendants convicted of other capital offenses cannot be sentenced to death without further jury findings at the penalty phase." (Doc. # 23 at 93). In Barber's view, "[t]his violates the requirements of due process and the Sixth, Eighth, and Fourteenth Amendments, as well as the integrity of the jury's judgment." (*Id.*). In particular, he claims the state court's reliance on *Waldrop* resulted in a decision that was contrary to and an unreasonable application of two Supreme Court precedents: *Simmons v. South Carolina*, 512 U.S. 154 (1994) and *Caldwell v. Mississippi*, 472 U.S. 320 (1985). The court is unpersuaded. The Alabama Court of Criminal Appeals' reliance on *Waldrop* in affirming Barber's sentence did not result in a decision that was either contrary to or an unreasonable application of *Simmons*, *Caldwell*, or any other Supreme Court precedent.

First, Barber claims that under *Simmons*, due process entitled him to inform the guilt-phase jury about the nature and consequences of finding him guilty of murder during a robbery, a finding that exposed him to the death penalty under Alabama law. (Docs. # 1 at 138-39; 23 at 94). Barber appears to be arguing that under *Simmons* he was entitled to inform the guilt-phase jury that a conviction for murder during a robbery would result in his maximum imposable sentence being death. (*Id.*). But *Simmons* requires nothing of the sort.

*Simmons* held that, where a defendant's future dangerousness is at issue in the penalty phase of a capital trial and the defendant is ineligible for parole under state law, "due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156 (plurality opinions). A plurality of the Court reached that conclusion based on the principle

that due process "does not allow the execution of a person on the basis of information which he had no opportunity to deny or explain." *Id.* at 161 (internal quotation marks omitted). At the penalty phase of Simmons' capital trial, the state argued for the death penalty in part on the basis that Simmons "would pose a future danger to society if he were not executed." *Id.* at 162. Simmons sought three times to inform the jury that he was in fact ineligible for parole under state law and thus would spend the rest of his life in prison if not executed, but the trial court denied each request. *Id.* A plurality of the Supreme Court[16] concluded that Simmons was denied due process because the state "succeeded in securing a death sentence on the ground, at least in part, of [Simmons'] future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole." *Id.*

*Simmons* simply did not address the argument Barber makes in this case: that due process entitled him to inform the jury at the *guilt* phase of his trial that a conviction for murder during a robbery would expose him to a maximum sentence of death. Instead, *Simmons* spoke to what a defendant must be permitted to inform the jury of at the *penalty* phase of his trial where the state relies on the concealment of critical information (whether the defendant has the chance of ever leaving prison) to argue that death is the only appropriate sentence. As both the plurality and Justice O'Connor's concurring opinion recognized, the Court's decision in *Simmons* represented a narrow exception to the "broad proposition" espoused in other Supreme Court decisions "that [federal courts] generally will defer to a State's determination as to what a jury should and should not be told about sentencing." *Id.* at 168 (plurality opinion); *see also id.* at 177 (O'Connor, J., concurring in the judgment). There is nothing in Barber's case approaching the

---

[16] Justices O'Connor and Kennedy and Chief Justice Rehnquist concurred only in the judgment. *Simmons*, 512 U.S. at 175-78.

stark facts presented in *Simmons* that would justify departing from the normal rule. Unlike the prosecution in *Simmons*, the state in Barber's case in no way concealed critical facts about the effect of the jury's guilt-phase verdict. And, most fundamentally, Barber has identified no clearly established Supreme Court precedent holding that a defendant has a constitutional right to inform a guilt-phase jury that a conviction for a particular offense will result in the defendant being eligible for the death penalty.[17] The state court's decision was neither contrary to nor an unreasonable application of *Simmons*.

Second, Barber claims the state court's affirmance of Barber's death penalty was contrary to and an unreasonable application of *Caldwell*. (Doc. # 1 at 136, ¶ 276). He appears to argue that the imposition of a death sentence following an advisory jury verdict violates "the Eighth Amendment as interpreted by *Caldwell*, because the jury was led to believe that it played only an advisory role in Mr. Barber's fate." (Doc. # 23 at 94).[18] *Caldwell* held that a prosecutor's statements urging a penalty-phase jury "not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court" rendered the defendant's death sentence unconstitutional. 472 U.S. at 323. But Barber has identified no statements at his penalty-phase proceeding that could have led the jury "to believe

_____

[17] Moreover, the court notes that at his trial Barber did not ask the court to inform the jury that a conviction for murder during a robbery could result in a death sentence. In fact, Barber's counsel asked the court to expressly tell the jury members that they were not to consider punishment at the guilt phase of the trial. (Vol. 11, Tab R-21 at 1165). The court complied with Barber's request and instructed the jury members that "[p]unishment is not to be discussed or considered by you in arriving at a true and just verdict as to whether or not the Defendant is guilty of any offense charged or if he's not guilty of anything. You are not to discuss or be concerned with at all any punishment that might result from a verdict of guilty of any offense." (*Id.* at 1166). This further factually distinguishes this case from *Simmons*, where the petitioner sought three times to inform the jury of the effect a life-imprisonment verdict would have. 512 U.S. at 162.

[18] Barber also cites *Adams v. Texas*, 448 U.S. 38 (1980) in this portion of his habeas petition and reply brief (Docs. # 1 at 139, ¶ 283; 23 at 94), but he does not attempt to explain how the Alabama Court of Criminal Appeals' decision is either contrary to or an unreasonable application of *Adams*. In any event, the state court's decision did not contravene *Adams*, which held that Texas violated the Constitution "when it excluded members of the venire from jury service because they were unable to take an oath that the mandatory penalty of death or imprisonment for life would not affect their deliberations on any issue of fact." 448 U.S. at 40. No jury-service oath is at issue in this case.

that responsibility for determining the appropriateness of a death sentence rests not with" it, but with some other decisionmaker. *Id.* And a review of the record confirms that no such statements were made. (Vol. 12, Tabs R-28 through R-31 at 1282-1325). Indeed, every phase of Barber's sentencing proceeding impressed upon the jury the importance of coming to its own conclusion about the appropriate sentence based on the law and the evidence before it.

In closing arguments, the prosecution told the jury, "Ultimately you will weigh those [aggravating and mitigating] factors and reach a determination as to the appropriate sentence. . . . That weighing process and that determination will be yours to make." (*Id.*, Tab R-28 at 1285-86). The defense emphasized in its closing argument that the jury's decision was "a life or death decision," and thus that it should consider all the relevant information it possibly could. (*Id.*, Tab R-29 at 1290). The defense even described the jury's verdict form as "a piece of paper giving [the state] permission to kill [Barber]." (*Id.* at 1298). The defense concluded its closing argument by telling the jury, "[Barber] does not deserve to die. Please don't kill him." (*Id.*). Finally, the prosecution in its rebuttal argument reiterated to the jury:

> [Y]ou have a function in this trial as Judge Little has explained to you. And your function is to make a determination on the evidence that has come to you and you're going to weigh it. . . . [Y]ou keep in mind we all have our functions and your function here right now is to make that call, and you make that call in a methodical way, not in an emotional way, not because of them seated over there or not because of him seated here. Just on what you heard and what you think the just result is in this case.

(*Id.*, Tab R-30 at 1305-06). Thus, unlike in *Caldwell*, nothing in the record suggests Barber's jury was encouraged to view its decision whether to return a death verdict as belonging to anyone besides itself. To the contrary, the jury was repeatedly reminded of the weight of its responsibility and encouraged to apply the law to the evidence before it to reach a just result. Therefore, Barber has not shown that the state court's decision affirming his death sentence was

contrary to or an unreasonable application of *Caldwell* or any other Supreme Court precedent. Accordingly, Barber is not entitled to habeas relief on this claim.

> ### G. Barber's Claim Based on the Trial Court's Admission of Testimony About the Partial Palm Print

At Barber's trial, the trial court admitted testimony by a state witness that a partial palm print in Epps' blood found at the crime scene belonged to Barber. Barber claims the admission of this testimony violated the Fourteenth Amendment's Due Process Clause because the state failed to adequately preserve the partial palm print so Barber's defense team could independently examine it. (Doc. # 1 at 139-44). The Alabama Court of Criminal Appeals rejected this claim on direct appeal, finding no due process violation because "it does not appear that the State acted in bad faith in not preserving the bloody palm print" and because an independent examination of the bloody palm print was "not particularly material or critical to [Barber's] defense strategy at trial." *Barber*, 952 So. 2d at 425-26. As explained below, the state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent; therefore, Barber is not entitled to habeas relief.

Investigators recovered a bloody palm print on the surface of a countertop in Epps' home following her murder. (Vol. 9, Tab R-16 at 699-700). The portion of the countertop containing the bloody palm print was admitted at trial as State's Exhibit 30. (*Id.* at 749). Dan Lamont, a latent print examiner at the Huntsville Police Department, testified at trial concerning his analysis of the bloody palm print. (*Id.* at 770-73). He explained that that the bloody palm print as it appeared at trial did not look the same as when he first examined it because "[i]t's degraded. There's very little left of the original print." (*Id.* at 770). Still, Lamont proceeded to tell the jury the process by which he had compared the fresh bloody palm print on the countertop to known ink prints of Barber's palms. (*Id.* at 770-73). He concluded his direct-examination testimony by

stating his opinion that the bloody palm print found on the countertop "was identical with the right inked palm print on the palm print card of James Edward Barber." (*Id.* at 773).

Barber claims the admission of Lamont's testimony violated the Fourteenth Amendment's Due Process Clause because the state failed to adequately preserve the bloody palm print and thereby deprived Barber's defense team the chance to independently examine it and potentially rebut Lamont's conclusion that the print was Barber's. He argues the state court's decision rejecting his claim was unreasonable because "a defendant need not show bad-faith on the part of the State" to establish a due process violation based on the state's failure to preserve potentially useful evidence. (Doc. # 1 at 141). But his argument is unavailing under clearly established Supreme Court precedent, which holds that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

At the time of Barber's direct appeal, *Youngblood* and *Illinois v. Fisher*, 540 U.S. 544 (2004) were the only Supreme Court precedents addressing due process claims based on the state's failure to preserve potentially useful evidence. *Youngblood* involved a defendant accused of kidnapping and sodomizing a ten-year-old boy. 488 U.S. at 52-53. Though following the attack police collected a sexual assault kit, the boy's underwear, and his t-shirt, they failed to timely test the kit samples and failed to properly refrigerate the boy's clothing for future testing. *Id.* at 52-53. A police criminologist examined the boy's clothing for the first time more than a year after the attack and found two semen stains on the clothing. *Id.* at 54. When tested, however, the stains proved "inconclusive as to the assailant's identity." *Id.* Earlier tests on the sexual assault kit had also failed to identify the boy's assailant, so the state relied at trial on the boy's visual identification of Youngblood as the perpetrator of the crime. *Id.* at 53-54.

Both the state and Youngblood presented expert testimony at trial regarding "what might have been shown by tests performed on the samples shortly after they were gathered, or by later tests performed on the samples from the boy's clothing had the clothing been properly refrigerated." *Id.* at 54. At least some of that testimony tended to show that "timely performance of tests with properly preserved semen samples could have produced results that might have completely exonerated [Youngblood]." *Id.* at 55. However, the jury ultimately convicted Youngblood. *Id.* at 124.

The state appellate court reversed Youngblood's conviction, holding that "when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process." *Id.* at 54. The Supreme Court, in turn, reversed the state appellate court and held that the state's failure to preserve the evidence had not violated Youngblood's federal due process rights. *Id.* at 58-59. The Court explained that under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, the Due Process Clause is violated whenever the prosecution "fails to disclose to the defendant material exculpatory evidence," regardless of whether the state acted in good faith or bad faith. *Id.* at 57. But "the Due Process Clause requires a different result," the Court held, when dealing with "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* In such cases, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. Because the Court concluded that the state's failure to refrigerate the boy's clothing and perform timely tests on the semen samples was not the result of bad faith but could "at worst be described as negligent," it found no due process violation. *Id.*

On a different set of facts, the Supreme Court applied *Youngblood* in *Fisher* to hold, again, that a defendant's federal due process rights had not been violated. 540 U.S. at 549. The defendant, Fisher, was arrested in 1988 during a traffic stop when police "observed him furtively attempting to conceal a plastic bag containing a white powdery substance." *Id.* at 545. Four tests conducted by police crime labs confirmed that the bag contained cocaine, and Fisher was charged with possession of cocaine. *Id.* He filed a discovery motion eight days later seeking all physical evidence the state planned to use at trial. *Id.* The state responded that it would provide the evidence "at a reasonable time and date upon request." *Id.* Fisher was released on bond pending trial and, when he failed to appear for trial, the trial court issued a warrant for his arrest. *Id.* Fisher remained a fugitive for over ten years, but was eventually apprehended on an unrelated matter. *Id.* At that time, the state reinstated the cocaine-possession charge from more than ten years earlier. *Id.*

In September 1999, shortly before Fisher was recaptured, the police, in accordance with established procedures, destroyed the substance seized from him during his arrest ten years earlier. *Id.* at 546. Fisher moved to dismiss the cocaine-possession charge based on the state's destruction of evidence. *Id.* The trial court denied the motion, and at trial the state introduced evidence showing that the substance Fisher possessed in 1988 was indeed cocaine. *Id.* The jury convicted Fisher of cocaine possession, and he was sentenced to one year in prison. *Id.*

The Supreme Court held that Fisher's conviction for cocaine possession did not violate the Due Process Clause, notwithstanding the police's destruction of the substance seized during his 1988 arrest. *Id.* at 548-49. The court explained that the substance seized from Fisher "was plainly the sort of 'potentially useful evidence' referred to in *Youngblood*, not the material exculpatory evidence addressed in *Brady*" and its progeny. *Id.* at 548. Because it was undisputed

that the police "acted in good faith and in accord with their normal practice" in destroying the evidence, the court held that Fisher had failed to establish a due process violation under *Youngblood*.

Like the semen stains in *Youngblood* and the white powdery substance in *Fisher*, the bloody palm print the state failed to adequately preserve in Barber's case was, at best, merely "potentially useful evidence," not material exculpatory evidence required to be disclosed to the defense under *Brady*. Put differently, the bloody palm print was at best "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated" Barber. *Youngblood*, 488 U.S. at 57. And in reality, given Barber's admission at his Rule 32 hearing that he did in fact kill Epps (Vol. 26 at 414-16), it can hardly be argued that the bloody palm print would have been even "potentially" useful to Barber—it would have been strictly inculpatory. There is also a substantial question about whether the state in fact "fail[ed] to preserve" the bloody palm print within the meaning of *Youngblood*, 488 U.S. at 58 and *Fisher*, 540 U.S. at 547.[19]

But even assuming that the bloody palm print was "potentially useful evidence" and that the state failed to adequately preserve it, Barber has neither argued nor shown that the state acted in bad faith by failing to photograph or otherwise preserve the bloody palm print from Epps' countertop. He certainly has not produced "clear and convincing evidence" that the state court erred in its finding that the prosecution did not act in bad faith in failing to preserve the bloody palm print, as required by § 2254(e)(1). *See Jones*, 753 F.3d at 1182. Because the state court

---

[19] The Alabama Court of Criminal Appeals made the following findings of fact about the bloody palm print: "Although Lamont did not photograph the bloody palm print, one of the investigators did photograph it at the crime scene. Further, the State introduced that photograph of the bloody palm print into evidence during the trial." *Barber*, 952 So. 2d at 425. The court also stated: "We have reviewed the portion of the countertop that was introduced into evidence, and we note that, even today, some portions of the bloody palm print are clearly visible." *Id.* at 425 n.3. Barber does not challenge these findings of fact before this court. Nonetheless, out of an abundance of caution, and for purposes of this petition, the court assumes that the state "fail[ed] to preserve" the bloody palm print within the meaning of *Youngblood*, 488 U.S. at 58 and *Fisher*, 540 U.S. at 547.

reasonably concluded that the state did not act in bad faith, *Barber*, 952 So. 2d at 425, its holding

that Barber failed to establish a federal due process violation was neither contrary to nor an

unreasonable application of *Youngblood* and *Fisher*. Barber is not entitled to habeas relief on this

claim.

### H.      Barber's Claim That the State Vouched for the Credibility of Its Witnesses

Barber argues that the prosecutor in his case impermissibly vouched for the credibility of

two state witnesses during his closing argument, in violation of the Fourteenth Amendment's

Due Process Clause. (Doc. # 1 at 155-58). The court disagrees.

### 1.      Barber's Arguments and the State Court's Decision

In closing arguments at Barber's trial, the prosecutor made the following statement about

Dan Lamont, the latent print examiner who testified that the bloody palm print found on Epps'

countertop was Barber's:

> [The defense] knew they had to attack everything. They attacked Dan Lamont.
> And I will say this to you all. If we had no confession in this case, we would
> certainly be before you today with a bloody palm print and our expert witnesses
> and evidence having to do with that bloody palm print. We would still be here
> prosecuting it. And I will also be the first to admit, it would not be as strong a
> case as what we have. *But when you look through this and you look at Dan
> Lamont, and they were on him, I think we all came away with a feeling that Dan
> Lamont is an upright, qualified fingerprint examiner.*

(Vol. 11, Tab R-20 at 1121-22) (emphasis added). Barber complains about the emphasized

portion of the above statement, claiming it constitutes impermissible vouching in violation of the

Due Process Clause.

The prosecutor also made the following statement about Investigator Dwight Edger, who

took Barber's confession:

> Let me say something briefly about the investigation of this case. This case lent
> itself to a really clear, concise picture for you all as to the investigation. And this
> is an overwhelmingly strong case because of that man seated over there,
> Investigator Edger. *And I don't have to tell y'all about Investigator Edger*

*because you know him from being here in court and from watching those video tapes. And, you know, that was a first rate professional investigation. And they know it too the truth be known.* But, you know, the confession itself, like I say, it's a fascinating piece of video. I urge you to go back and watch it. I really do.

(*Id.* at 1128-29) (emphasis added). Barber complains about the emphasized portion of the above statement, claiming that it too constitutes impermissible vouching in violation of the Due Process Clause.

The Alabama Court of Criminal Appeals rejected Barber's due process claims related to each statement. *Barber*, 952 So. 2d at 443. It observed that during closing argument, Barber's counsel had "challenged Lamont's testimony, arguing repeatedly that his findings were subjective and that his conclusion was 'junk.'" *Id.* Barber's counsel also "argued that Edger improperly focused his efforts on [Barber] and did not conduct a thorough investigation." *Id.* Viewed in context, the court concluded the prosecutor's statements were "appropriate comments on the evidence and replies-in-kind to defense counsel's arguments regarding Lamont's testimony and Edger's investigation." *Id.* It therefore held that "[t]he prosecutor's statements did not amount to vouching for the credibility of his witnesses." *Id.*

Barber argues the state court's decision was contrary to and an unreasonable application of *Berger v. United States*, 295 U.S. 78 (1935) and *United States v. Young*, 470 U.S. 1 (1985). As explained below, the state court did not act contrary to or unreasonably apply *Berger*, *Young*, or any other Supreme Court precedent in denying Barber's claim.

## 2. Relevant Supreme Court Precedents

In *Berger*, the Supreme Court reversed a conviction where the prosecutor, through questioning and argument, had made "improper suggestions, insinuations, and . . . assertions of personal knowledge" about additional evidence not before the jury. 295 U.S. at 88. The Court stated that the prosecutor "was guilty of misstating the facts in his cross-examination of

witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner." *Id.* at 84. Based on the prosecutor's "pronounced and persistent" misconduct that had "a probable cumulative effect upon the jury," the Court concluded that "[a] new trial must be awarded." *Id.* at 89.

The Supreme Court further developed the standards that govern prosecutorial vouching for witness credibility in *Young*. During closing arguments at Young's trial for defrauding an oil refinery called Apco, defense counsel accused the prosecution of unfairly presenting the case, seeking to "poison [the juror's] minds," withholding exculpatory evidence, engaging in "reprehensible" conduct, and not believing that Young was guilty of the crime charged. *Young*, 470 U.S. at 4-5. Defense counsel also stated that Young "had been the only one in this whole affair that has acted with honor and with integrity." *Id.* at 5 (internal quotation marks omitted).

In his rebuttal argument, the prosecutor responded to several of defense counsel's statements. First, the prosecutor rebutted defense counsel's claim that the prosecution did not believe Young was guilty:

> I think [defense counsel] said that not anyone sitting at this table thinks that Mr. Young intended to defraud Apco. Well, I was sitting there and I think he was. I think he got 85 cents a barrel for every one of those 117,250.91 barrels he hauled and every bit of the money they made on that he got one percent of. So, I think he did. If we are allowed to give our personal impressions *since it was asked of me.*

*Id.* (alteration and emphasis in original) (internal quotation marks omitted). The prosecutor also responded to defense counsel's statement that Young had not defrauded Apco: "I don't know what you call that, I call it fraud. You can look at the evidence and you can remember the testimony, you remember what [the witnesses] said and what [Young] admitted they said. I think it's a fraud." *Id.* (first alteration in original) (internal quotation marks omitted). Finally, the prosecutor responded to defense counsel's claim that Young acted with honor and integrity. *Id.* at 5-6. After recapping some of Young's conduct, the prosecutor stated:

> I don't know whether you call it honor and integrity, I don't call it that, [defense counsel] does. If you feel you should acquit him for that it's your pleasure. I don't think you're doing your job as jurors in finding facts as opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in [this] Oklahoma courtroom and say that's honor and integrity; I don't believe it.

*Id.* (first alteration in original) (internal quotation marks omitted).

The Supreme Court acknowledged that "the prosecutor's response constituted error," but it nevertheless affirmed Young's conviction under the plain-error doctrine because Young did not object to the statements at trial. *Id.* at 14. It found no plain error because, though the prosecutor's statements were improper, they were not so prejudicial as to lead the Court to "conclude that the jury's deliberations were compromised." *Id.* at 18. The Court acknowledged "two dangers" posed by prosecutorial comments that "vouch[ ] for the credibility of witnesses and express[ ] [the prosecutor's] personal opinion concerning the guilt of the accused." *Id.* First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.* at 18. Second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.*

at 19. But the Court found neither danger implicated by the prosecutor's comments at Young's trial. *Id.* The prosecutor's statement that he believed Young intended to commit fraud "contained no suggestion that he was relying on information outside the evidence presented at trial." *Id.* And the "overwhelming evidence" of Young's guilt "eliminate[d] any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury." *Id.* Because the prosecutor's remarks did not "undermine the fairness of the trial and contribute to a miscarriage of justice," the Court affirmed Young's conviction. *Id.* at 20.

### 3. The State Court's Rejection of Barber's Vouching Claim Was Reasonable

The state court did not act contrary to or unreasonably apply *Berger*, *Young*, or any other Supreme Court precedent in rejecting Barber's vouching claim. *Berger* is easily distinguishable from Barber's case. The prosecutor's statements in *Berger* were egregious and pervasive. As the Court put it: "It is impossible . . . , without reading the testimony at some length, and thereby obtaining a knowledge of the setting in which the objectionable matter occurred, to appreciate fully the extent of the [prosecutor's] misconduct." 295 U.S. at 85. The prosecutor's many errors included misrepresenting facts during cross-examination, putting words in witnesses' mouths, and suggesting he was privy to additional evidence not presented to the jury. *Id.* at 84. The Court characterized the situation as "one which called for stern rebuke and repressive measures and, perhaps, if these were not successful, for the granting of a mistrial." *Id.* at 85. Nothing remotely similar can be said of the prosecutor's statements at Barber's trial. Barber complains about a total of four sentences the prosecutor uttered in his closing argument, a far cry from the "pronounced and persistent" misconduct by the prosecutor in *Berger. Id.* at 89. Moreover, the four sentences Barber complains of do not even begin to approach the severe prosecutorial misconduct at issue

in *Berger*. The state court did not act contrary to or unreasonably apply *Berger* in rejecting Barber's claim.

*Young* is also of no help to Barber. Leaving aside the fact that the *Young* Court *affirmed* the defendant's conviction, even the language in that opinion Barber relies on, 470 U.S. at 18-19, does not establish that the state court acted contrary to or unreasonably applied clearly established federal law. Nothing in the prosecutor's remarks "convey[ed] the impression that evidence not presented to the jury, but known to the prosecutor, support[ed] the charges against" Barber. *Id.* at 18. Barber apparently recognizes this and instead argues (Doc. # 23 at 82-83) that the prosecutor's statements may have "induce[d] the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19. But that assertion is wholly unsupported.

Barber specifically complains about the prosecutor's use of the terms "upright" and "qualified" to describe Lamont, and "first rate" and "professional" to describe Investigator Edger's investigation. (Doc. # 23 at 82). In rejecting Barber's claim, the state court explained that "[a] distinction must be made between an argument by the prosecutor personally vouching for a witness . . . and an argument concerning the credibility of a witness based upon the testimony presented at trial." *Barber*, 952 So. 2d at 443 (internal quotation marks omitted). Viewed in context, the state court concluded that the prosecutor's statements were of the latter type—"appropriate comments on the evidence and replies-in-kind to defense counsel's arguments regarding Lamont's testimony and Edger's investigation." *Id.* at 443. This court cannot say that conclusion was unreasonable under the deferential standard of review imposed by § 2254(d). The prosecutor's statement, "I think we all came away with a feeling that Dan Lamont is an upright, qualified fingerprint examiner" (Vol. 11, Tab R-20 at 1122), can

reasonably be construed as commenting upon the considerable testimony the jury heard regarding Lamont's qualifications and methodology (Vol. 9, Tab R-16 at 737-47), rather than an impermissible attempt to personally vouch for Lamont's credibility. The prosecutor's statement that Investigator Edger conducted "a first rate professional investigation" (Vol. 11, Tab R-20 at 1128) can likewise reasonably be construed as a comment on the extensive testimony the jury heard from Edger regarding his qualifications and experience investigating crimes and details about the investigation he conducted in Barber's case. (Vol. 10 at 968-87). Indeed, the prosecutor's preceding comment, "I don't have to tell y'all about Investigator Edger because you know him from being here in court and from watching those video tapes" supports this interpretation. (Vol. 11, Tab R-20 at 1128). Because this court cannot say the state court's rejection of Barber's vouching claim was contrary to or unreasonable application of *Berger*, *Young*, or any other Supreme Court precedent, Barber is not entitled to habeas relief on this claim.

I.  **Barber's Claim That the Trial Court Permitted Improper Opinion Testimony at the Penalty Phase**

Barber claims the trial court erred in permitting Investigator Edger to give his opinion at the penalty phase that Barber's crime was especially heinous, atrocious, and cruel as compared to other capital murder cases he had investigated and to speculate regarding Barber's motive for killing Epps. (Vol. 12, Tab R-26 at 1213-14). Barber argues Investigator Edger's opinion testimony was inadmissible because it concerned an ultimate issue—whether the crime was especially heinous, atrocious, and cruel. (Doc. # 1 at 144-45, ¶ 293). He also argues Investigator Edger's testimony that Barber killed Epps "for no other reason . . . than to take what small amount of money he could get to purchase drugs with" (Vol. 12, Tab R-26 at 1214) violated the Eighth and Fourteenth Amendments. (Doc. # 1 at 147, ¶ 301).

The Alabama Court of Criminal Appeals rejected both arguments on direct appeal. *Barber*, 952 So. 2d at 454-58. It held that neither portion of Investigator Edger's penalty-phase testimony was improper opinion testimony under Alabama law and that, in the alternative, any error in the admission of the testimony was harmless. *Id.* at 456.

Federal habeas relief is precluded on this claim because Barber has not shown that the state court's decision was contrary to or involved an unreasonable application of clearly established Supreme Court precedent. Barber has not identified any Supreme Court case that the state court's decision was arguably contrary to or an unreasonable application of. The only Supreme Court case he cites in support of this claim is *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). But *Daubert* interpreted the Federal Rules of Evidence, 509 U.S. at 587, which do not apply in state court. Instead, the admissibility of testimony in an Alabama criminal trial is governed by the Alabama Rules of Evidence and other relevant state law. *See Barber*, 952 So. 2d at 455. Even assuming the state court erred in applying state law, state-law errors provide no basis for federal habeas relief. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). And, though Barber alleges that the application of Alabama's evidentiary rules violated his federal constitutional rights (Doc. # 1 at 147, ¶ 301), he has not identified a single case, decided by the U.S. Supreme Court or any other court, to support that contention. Accordingly, Barber is not entitled to habeas relief on this claim.

J.    **Barber's Claim That Alabama's Death-Qualification Process Produced a Conviction-Prone Jury in Violation of His Right to an Impartial Jury**

Barber claims that Alabama's death-qualification process produced a conviction-prone jury in violation of his right to an impartial jury. (Doc. # 1 at 148-49). Barber does not explain what "death qualification" in Alabama entails, but the court understands he refers to the practice the Supreme Court addressed in *Lockhart v. McCree*, 476 U.S. 162, 166 (1986), in which

prospective jurors who state they could not under any circumstances vote for the imposition of the death penalty are removed for cause prior to the guilt-phase of a capital trial. Barber contends this practice "disproportionately excludes minorities and women, provides a basis for the prosecution to use peremptory challenges to remove additional venire members from the jury, and conditions the jury toward guilt," in violation of his constitutional right to an impartial jury. (Doc. # 1 at 148, ¶ 302).

The Alabama Court of Criminal Appeals rejected Barber's death-qualification claim on direct appeal. *Barber*, 952 So. 2d at 446-47. It reasoned that the Supreme Court had upheld the practice of death qualification in *Lockhart* and that it was "not improper for a prosecutor to use peremptory challenges to remove veniremembers because they have expressed strong opposition to the death penalty." *Id.* at 447. The state court thus found Barber's claim meritless.

That decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. To the contrary, it was entirely consistent with the Supreme Court's decision in *Lockhart*, which upheld as constitutional the very practice Barber now challenges. 476 U.S. at 173 ("[T]he Constitution does not prohibit the States from 'death qualifying' juries in capital cases."). Barber is not entitled to habeas relief on this claim.

K.   **Barber's Claim That the State's Decision to Seek the Death Penalty Was Impermissibly Influenced by the Victim's Family Members**

Barber claims that the state's decision to seek the death penalty was impermissibly influenced by the victim's family members and that his death sentence was therefore unconstitutionally obtained. (Doc. # 1 at 149-52). For the reasons explained below, Barber is not entitled to habeas relief on this claim.

### 1. Factual Background

In an order entered July 30, 2002, the state trial court ordered the prosecution to inform the court and opposing counsel within 30 days whether the state intended to seek the death penalty in Barber's case. (Vol. 1, Tab R-1 at 15). When the state failed to respond to the order within 30 days, Barber's counsel filed a motion to preclude the state from seeking the death penalty. (*Id.* at 25). The trial court provisionally granted Barber's motion. (*Id.* at 34). In its order provisionally granting the motion, the trial court stated:

> [T]he Defendant's Motion To Preclude The State From Seeking The Death Penalty is GRANTED; provided, the State may file with the Court a statement as to their reasons for not responding to the previous Order of this Court, and whether or not the State is seeking the death penalty, and if so the specific factual basis for such penalty.
>
> The State shall be allowed ten (10) days in order to file such response. If no response is filed within that time, then this Order shall become final.

(*Id.*).

The state responded to that order two days later. (*Id.* at 30-31). In its response, the state apologized to the court for inadvertently failing to respond to the court's July 30, 2002 order and explained that the state had communicated to defense counsel its intent to seek the death penalty "from the preliminary hearing on." (*Id.* at 30). The prosecutor explained that Epps' family "was asked to meet with us to discuss their feelings prior to a formal response" to the court's July 30, 2002 order, and that the state's heavy trial schedule in August prevented the meeting with Epps' family from occurring until early September. (*Id.*). The prosecutor further stated, "At that meeting, [Epps' family] made clear their wish to seek the death penalty." (*Id.*). The prosecutor went on to explain that he mistakenly believed the court had already been previously informed of the state's decision to seek the death penalty and that he was not aware that either the court or defense counsel needed clarification on the issue until he received Barber's "Motion to Preclude"

and the court's order provisionally granting the motion. (*Id.*). Finally, the prosecutor clarified that the state was indeed seeking the death penalty and that its factual basis for doing so were the aggravating circumstances that the murder occurred during a robbery and was especially heinous, atrocious, or cruel. (*Id.* at 31).

Four days after the state filed its response, the trial court entered an order setting aside its previous order provisionally granting Barber's motion to preclude. (*Id.* at 29). The new order allowed the state "to pursue the death penalty in this case if the Defendant is convicted by a jury of the charge of capital murder." (*Id.*).

## 2.    Analysis

On direct appeal, after reviewing the sequence of events just recited, the Alabama Court of Criminal Appeals concluded:

> The record does not support the inference that the wishes of the victim's family impermissibly influenced the State's decision to seek the death penalty in this case. Rather, it appears that the State had previously indicated its intent to seek the death penalty, based on the circumstances of the offense, before consulting with the victim's family. It further appears that defense counsel was well aware of that intent because defense counsel indicated that the State was seeking the death penalty in this case in a notice of withdrawal of counsel due to a conflict of interest that was filed on August 23, 2002; in a motion to reconsider and demand for an *in camera* hearing that was filed on August 26, 2002; and in a demand for an *in camera* hearing that was filed on August 26, 2002. The meeting with the victim's family appears to have been more of a formality before responding to the trial court's order than a time to decide whether to seek the death penalty.

*Barber*, 952 So. 2d at 463. The state appellate court therefore rejected Barber's claim that the victim's family impermissibly influenced the state's decision to seek the death penalty.

Barber is not entitled to habeas relief on this claim for two reasons. First, Barber's federal constitutional claim depends on overturning a factual determination made by the state court, and Barber has failed to make the requisite showing under 28 U.S.C. § 2254(e)(1) for rebutting state-court findings of fact. Second, even if Barber could make the required showing on the factual

issue (and, to be clear, he cannot), he has still failed to show that the state court's adjudication of his claim was contrary to or an unreasonable application of clearly established Supreme Court precedent, as required by 28 U.S.C. § 2254(d)(1).

### a.    The State Court's Factual Determination Stands

Based on its review of the record, the state court determined that the prosecution decided to seek the death penalty in Barber's case before it ever met with Epps' family. It noted that "the State had previously indicated its intent to seek the death penalty, based on the circumstances of the offense, before consulting with the victim's family." *Barber*, 952 So. 2d at 463. It cited several court documents filed by defense counsel *before* the prosecution met with Epps' family that indicated the state was seeking the death penalty. *Id.* (making reference to documents in the record contained at Vol. 1, Tab R-1 at 16, 18, 20). And it therefore concluded that "[t]he meeting with the victim's family appears to have been more of a formality before responding to the trial court's order than a time to decide whether to seek the death penalty." *Id.* Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Barber has not offered any evidence to rebut the state court's finding on this factual issue, let alone clear and convincing evidence. Barber's federal constitutional claim that that the victim's family *impermissibly* influenced the state's decision to seek the death penalty cannot succeed unless Barber first shows that the victim's family in fact *influenced* the state's decision to seek the death penalty. Because the state court found that the decision to seek the death penalty was made before the meeting with Epps' family, and because Barber has failed to rebut that finding, habeas relief is precluded.

### b.    The State Court's Rejection of Barber's Claim Was Reasonable

Even if it could be inferred that the state's decision to seek the death penalty in Barber's case was influenced in part by a meeting with Epps' family, the state court did not act contrary to or unreasonably apply clearly established Supreme Court precedent in rejecting Barber's claim. Barber argues that "[f]ederal law clearly establishes that a prosecutor may not consider the opinions of a victim's family when deciding whether to seek capital punishment." (Doc. # 23 at 103). But the Supreme Court precedents Barber cites do not establish that principle.

Barber's argument proceeds in three parts. First, he claims *Gregg v. Georgia* established the principle that "the standards by which [prosecutors] decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence." 428 U.S. 153, 225 (1976) (White, J., concurring in the judgment). Second, he claims *Booth v. Maryland* established the principle that sentencing juries are constitutionally forbidden from considering victim impact statements at the sentencing phase of a capital trial. 482 U.S. 496, 503-09 (1987). Based on his view that *Booth* forbids capital sentencing juries from considering victim impact statements and that *Gregg* requires prosecutors to base their charging decisions only on those facts that juries may base their sentencing decisions on, Barber claims it was unconstitutional for the state to base its decision to seek the death penalty in part on statements made by Epps' family.

Barber's argument fails at every point. First, *Gregg* did not establish a constitutional rule that the only factors a prosecutor may consider in deciding whether to *seek* the death penalty are those factors a jury is constitutionally permitted to consider at sentencing when deciding whether to *impose* the death penalty. *Gregg* involved a constitutional challenge to a death sentence imposed under Georgia's recently amended capital sentencing law. 428 U.S. at 162-63 (opinion

of Stewart, J.). The Court held by a vote of 7-2 that Georgia's capital sentencing scheme did "not violate the Constitution," and the Court therefore affirmed Gregg's death sentence. *Id.* at 207 (opinion of Stewart, J.). Though seven Justices agreed with that result, no one opinion garnered the assent of more than three Justices. Justice Stewart announced the judgment of the Court and delivered an opinion joined by Justices Powell and Stevens, *id.* at 158-207; Justice White delivered an opinion concurring in the judgment joined by Chief Justice Burger and Justice Rehnquist, *id.* at 207-26; and Justice Blackmun delivered an opinion concurring in the judgment for himself only, *id.* at 227. Importantly, *none* of the relevant opinions endorsed a constitutional rule limiting the criteria prosecutors may permissibly consider in deciding whether to seek the death penalty in a given case.

In his opinion, Justice Stewart addressed the defendant's argument that under Georgia's capital sentencing scheme, "the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them." *Id.* at 199. That discretion posed no constitutional problem, Justice Stewart concluded, because it merely permitted the prosecutor to "make[ ] a decision which may remove a defendant from consideration as a candidate for the death penalty," and "[n]othing in any of [the Court's] cases suggests that the decision to afford an individual defendant mercy violates the Constitution." *Id.* Far from prohibiting prosecutors from exercising broad discretion based on a variety of factors in deciding when to seek the death penalty for a particular capital offense, Justice Stewart's opinion expressly permits the state to exercise such discretion.

Justice White's opinion also rejected the defendant's argument that "prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies" as "unsupported by any facts." *Id.* at 225. Justice White reasoned:

Absent facts to the contrary it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments *the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.* Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong.

*Id.* (emphasis added). As context makes clear, when Justice White made the statement Barber relies on -- "the standards by which [prosecutors] decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence" -- he was making a *descriptive* observation about the likely practices of prosecutors in the real world. *Id.* He was not laying down a constitutional rule forbidding prosecutors from considering criteria in their charging decisions -- such as victim impact statements -- that juries might not be permitted to consider at the sentencing phase of a capital case. Thus, the first premise of Barber's argument -- that *Gregg* requires prosecutors to base their charging decisions in capital cases only on those criteria that juries may base their sentencing decisions on -- is simply not true.

The second step in Barber's argument, premised on *Booth v. Maryland*, likewise founders. *Booth* did hold unconstitutional a death sentence imposed after a jury heard a victim impact statement at the sentencing phase of a capital trial. 482 U.S. at 502-03. The victim impact statement was compiled from interviews with the victims' family and was read to the jury by the prosecutor. *Id.* at 499-501. The statement "provided the jury with two types of information." *Id.* at 502. "First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family." *Id.* "Second, it set forth the family members' opinions and characterizations of the crimes and the defendant." *Id.* The Court held that "this information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally

unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner," in violation of the Eighth and Fourteenth Amendments. *Id.* at 502-03.

However, as Barber acknowledges, *Booth* was overruled four years later in *Payne v. Tennessee*, which held that the Eighth Amendment "erects no *per se* bar" to the admission of victim impact evidence in capital sentencing proceedings. 501 U.S. 808, 827 (1991). Still, Barber argues that though the *Payne* Court overruled *Booth*'s holding that evidence "relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing," it did not disturb *Booth*'s holding regarding the second type of evidence at issue in *Booth*—"a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Id.* at 830 n.2.

In a footnote, the Supreme Court in *Payne* did characterize the portion of *Booth* it did not overrule as holding "that the admission of a victim's family members' characterizations and opinions about the *crime*, the *defendant*, and the *appropriate sentence* violates the Eighth Amendment." *Id.* (emphasis added). But the court doubts *Booth* ever prohibited evidence about a victim's family's views on the *appropriate sentence* from being admitted in a capital sentencing proceeding. The *Booth* Court was primarily concerned about evidence of the victim's family's "opinions and characterizations of the *crimes* and the *defendant*." *Booth*, 482 U.S. at 502 (emphasis added); *see also id.* at 508-09. The *Booth* Court never expressly addressed what is at issue in this case: evidence of the family's "opinions about . . . the *appropriate sentence*." *Payne*, 501 U.S. at 830 n.2 (emphasis added). Though some language in the victim impact statement at issue in *Booth* could be construed as expressing family members' opinions about the appropriate sentence, 482 U.S. at 510-15, the Court only expressly condemned the presentation of the family's opinions about "the crimes" and "the defendant," not the appropriate sentence. *Id.* at

502, 508. Thus, it is not obvious that *Booth* prohibited evidence about a victim's family's views on the appropriate sentence from being admitted in a capital sentencing proceeding, especially if presented in a manner devoid of "emotionally charged opinions." *Id.* at 508. And, if "fairminded jurists could disagree" about *Booth*'s application to this case, that is enough to preclude federal habeas relief. *Harrington*, 562 U.S. at 102.

But, even assuming that *Booth* forbids the admission of a victim's family's opinions about the appropriate sentence at a capital sentencing proceeding, *Gregg*, as explained above, did not establish a constitutional rule forbidding *prosecutors* from considering the views of a victim's family when deciding whether to seek the death penalty against a defendant who has committed a capital crime. And for good reason. At the time prosecutors met with Epps' family, Barber had already been charged with capital murder, which under Alabama law has a maximum sentence of death. (Vol. 1, Tab R-1 at 8-9, 30). Moreover, the prosecution had already given defense counsel notice of its intent to seek the death penalty. (*Id.* at 16, 18, 20, 30); s*ee also Barber*, 952 So. 2d at 463. Thus, the only possible consequence of meeting with Epps' family was the possibility that the meeting might persuade the prosecutors *not* to seek the death penalty. And as Justice Stewart explained in *Gregg*, "[n]othing in any of [the Supreme Court's] cases suggests that the decision to afford an individual defendant mercy violates the Constitution." 428 U.S. at 199. In short, Barber has not shown that the prosecution's consideration of Epps' family's views about the appropriate sentence for his crime violated clearly established Supreme Court precedent beyond any possibility for fairminded disagreement.

Barber has failed to rebut the state court's factual determination that the prosecution's decision to seek the death penalty was made before it met with Epps' family, and he has failed to show that the state court acted contrary to or unreasonably applied clearly established Supreme

Court precedent in rejecting his claim. Barber is therefore not entitled to habeas relief on this claim.

### L. Barber's Claims That the Prosecutor Made Impermissible Comments on His Failure to Testify and Impermissibly Shifted the Burden of Proof to Him

Barber argues that his conviction was obtained in violation of the Constitution because the prosecutor made impermissible comments on his failure to testify and impermissibly shifted the burden of proof to him. (Doc. # 1 at 153-55). For the reasons explained below, Barber is not entitled to habeas relief on these claims.

### 1. Factual Background

In his initial closing argument at the guilt phase of Barber's trial, the prosecutor made the following statements:

> *And it's the last piece of evidence, I assume they would not*[ ] *want to talk about much, which is that confession. All they have to say was he's intoxicated.*
>
> Now, you had an opportunity to observe that confession and it's in evidence for you to observe again. And you can observe his level of intoxication. And it's interesting that he didn't, when initially picked up from that hotel room and interviewed within an hour at 1:00 in the morning when presumably most of whatever is in his system is in his system, he doesn't confess. Some ten hours later, ten hours that he's been in custody. They don't pass out drugs up in the Madison County jail. Ten hours later that he confesses, but you can see the tape.

(Vol. 11, Tab R-18 at 1083-84) (emphasis added). Barber contends that the emphasized portion of the above statement was an impermissible comment on Barber's failure to testify and impermissibly shifted the burden of proof to him. In his rebuttal closing argument, the prosecutor further stated:

> Dwight Edger got to the bottom of it because he stayed after him. *And Dwight said, you think, why would an innocent man confess. I almost feel ridiculous talk[ing] about it though. Why would he? Can you imagine any circumstance where an innocent man decides to confess to a murder he didn't do and a robbery he didn't do? I'll confess it. Why would he? You can't answer that.* And if you wanted to pretend like you could answer it, then ask yourself how could you do it? How can you confess on tape with detail, a detail in particular that only the

killer would know. What did you hit her with? There was a hammer there and I
grabbed the hammer. And I know we all remember Dr. Joe Embry up here in his
graphic testimony of the wounds Ms. Epps suffered. Crescent-shaped wounds,
crescent-shaped fractures, crescent-shaped depression[s] commonly seen with a
hammer.

(*Id.*, Tab R-20 at 1129-30) (emphasis added). Barber also contends the emphasized portion of the

above statement was an impermissible comment on Barber's failure to testify.

### 2.      The Prosecutorial-Commentary Claim

The Fifth Amendment's Self-Incrimination Clause provides, "No person shall . . . be

compelled in any criminal case to be a witness against himself." The Supreme Court has long

held that the Clause, which applies to the states through the Fourteenth Amendment, "forbids

either comment by the prosecution on the accused's silence or instructions by the court that such

silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965).

On direct appeal, the Alabama Court of Criminal Appeals rejected Barber's claim that the

prosecutorial statements described above were unconstitutional comments on his refusal to

testify. *Barber*, 952 So. 2d at 437-40. The court concluded that, viewed in proper context, neither

statement by the prosecutor was "of such a character that a jury would naturally and necessarily

construe it as a comment on the defendant's silence." *Id.* at 439, 440 (internal quotation marks

omitted). Instead, the court found the statements were permissible comments on the evidence and

responses to *defense counsel's* arguments. *Id.*

The state court's interpretation of the prosecutor's comments was not unreasonable, and

Barber has not shown that the state court acted contrary to or unreasonably applied clearly

established Supreme Court precedent in denying his claim. In context, the prosecutor's first

statement -- "And it's the last piece of evidence, I assume they would not[ ] want to talk about

much, which is that confession. All they have to say was he's intoxicated" -- was clearly a

comment on defense counsel's *arguments*, not Barber's *silence*. During cross-examination of Investigator Edger, who took Barber's confession, Barber's trial counsel insinuated that Barber may have been intoxicated when he confessed and thus that the confession should not be believed. (Vol. 10 at 1000-Vol. 11 at 1003). The prosecutor's statement simply noted defense counsel's argument ("All they [defense counsel] have to say was he [Barber] [was] intoxicated") and urged the jury to reject that argument based on the circumstances of the confession (it was taken at least 10 hours after Barber ceased using substances) and the contents of the video ("but you can see the tape"). (Vol. 11, Tab R-18 at 1083-84). Contrary to Barber's contentions, the word "they" in the prosecutor's statement clearly referred to Barber's trial counsel, not Barber himself. It was defense counsel, not Barber, who in the prosecutor's view "would not[ ] want to talk about [the confession] much" and who (again, in the prosecutor's view) unpersuasively claimed, "[Barber's] intoxicated." (*Id.* at 1083). Even if the prosecutor's statements are viewed as somewhat ambiguous on this point, Barber has failed to show the state court's conclusion that they were not directed at his failure to testify was unreasonable, beyond the possibility for any fairminded disagreement. Federal habeas relief is therefore precluded. *See Harrington*, 562 U.S. at 101-02.

The prosecutor's second statement regarding the slim likelihood of an innocent man confessing to a crime he did not commit was likewise a permissible response to defense counsel's argument rather than an impermissible comment on Barber's failure to testify. As the state court explained, prior to the prosecutor's second statement, defense counsel made an extensive argument attempting to show why an innocent person might confess to a crime. *Barber*, 952 So. 2d at 439-40. Taken in context, the prosecutor's statement that it was extremely unlikely Barber falsely confessed was clearly a response to defense counsel's suggestions to the

contrary. The statement simply contains no language, direct or indirect, that could reasonably be construed as a comment on Barber's failure to testify. And again, even if one finds the prosecutor's second statement somewhat ambiguous (to be clear, the court does not), Barber still has not shown that the state court's interpretation of the statement was unreasonable, beyond the possibility for any fairminded disagreement. Again, this fact alone precludes federal habeas relief. *See Harrington*, 562 U.S. at 101-02.

### 3. The Burden-Shifting Claim

Finally, the state court also reasonably concluded that neither of the prosecutor's statements improperly shifted the burden to Barber to prove his innocence. *Barber*, 952 So. 2d at 440-42. Neither statement "suggest[ed] that [Barber] was obligated to produce evidence or prove his innocence." *Id.* at 441. Instead, the "the prosecutor was commenting on the evidence, urging the jury to review the videotape of the confession for itself, to observe [Barber] on the videotape, and to reject the defense's contention that [Barber] was intoxicated when he made the statement." *Id.* at 441-42. Simply put, nothing in the prosecutor's statements suggested that Barber bore the burden of proof on any issue at trial.

Barber argues the state court's decision was contrary to and unreasonable application *Sandstrom v. Montana*, 442 U.S. 510 (1979) and *Mullaney v. Wilbur*, 421 U.S. 684 (1975), but he is wrong. Those cases both involved laws or jury instructions that expressly relieved the state of its burden of proving every element of the offense beyond a reasonable doubt. *See Sandstrom*, 442 U.S. at 512, 521 (jury instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" unconstitutionally relieved the state of its burden of proving that defendant acted with intent); *Mullaney*, 421 U.S. at 684-85, 703-04 (law that required defendant charged with murder to prove he acted in the heat of passion to reduce the murder charge to manslaughter unconstitutionally relieved state of its burden of proving an element of

murder—namely, that the defendant did *not* act in the heat of passion). No such law or jury instruction was present in Barber's case. Instead, the trial court clearly and correctly instructed the jury regarding the state's burden of proof and Barber's presumption of innocence. (Vol. 11, Tab R-21 at 1139-42); *see also Barber*, 952 So. 2d at 442. Indeed, the trial court expressly told the jury: "The burden never rests upon a defendant to disprove his guilt nor to disprove facts that would tend to establish his guilt." (Vol. 11, Tab R-21 at 1140). Instead, the court explained, the burden is "upon the State of Alabama to prove [Barber's] guilt beyond a reasonable doubt, that is, to prove each and every element of the charged offense beyond a reasonable doubt." (*Id.*). Barber has failed to show that the state court unreasonably rejected his claim of unconstitutional burden-shifting. He is therefore not entitled to habeas relief on that claim.

### M. Barber's Claim Based on the Trial Court's Admission of Barber's Confession

Barber claims that the trial court's admission of certain portions of his videotaped confession violated his federal constitutional rights. (Doc. # 1 at 158-60). Specifically, Barber complains about the admission of the following comments near the end of his videotaped confession: "I'm gonna get the death penalty for this. . . . Why do I even want attorneys? You know, just charge me with it and put me to death." (Vol. 23 at 1239, 1242). He claims those statements were inadmissible, irrelevant, and highly prejudicial and that the videotape should have been redacted to exclude those statements. He contends the comments were so prejudicial that their admission violated his constitutional rights.

The Alabama Court of Criminal Appeals rejected Barber's claim on direct appeal. *Barber*, 952 So. 2d at 429-30. The court concluded that Barber's statements, "viewed in the context of [his] entire statement, [appeared] to be genuine expressions of emotion and remorse about his actions." *Id.* at 430. The comments showed Barber "was aware of the seriousness of the

103

crime about which he was confessing" and therefore were not irrelevant or unfairly prejudicial. *Id.* Accordingly, the court found no error in their admission.

Barber has not shown that the state court acted contrary to or unreasonably applied clearly established Supreme Court precedent in rejecting this claim. Indeed, he does not identify a single Supreme Court precedent the state court allegedly contravened or misapplied. He is therefore not entitled to habeas relief on this claim. *See* 28 U.S.C. § 2254(d)(1).

### N.    Barber's Claim Based on the Jury Viewing Him in Shackles and Handcuffs

Barber claims his due process rights were violated when jurors briefly saw him in shackles and handcuffs in the hallway and saw him in handcuffs during his videotaped statement. (Doc. # 1 at 160-62). For the reasons explained below, Barber is not entitled to habeas relief on this claim.

During a recess just before deliberations began, three jurors briefly viewed Barber in handcuffs and leg shackles in a courthouse hallway. (Vol. 11, Tab R-21 at 1173). As defense counsel explained in his oral motion for a mistrial:

> [A]s the sheriff's department brought Mr. Barber down there were three jurors standing in the outside of Judge Hamilton's courtroom standing there talking, and I heard the elevator door open up and I heard the noise coming from the chains on Mr. Barber's legs and I got up and walked that way and tried to stop it, tried to get in front of them so I could prevent them from walking in front of the jurors. They stopped, they happened to stop right in front of where the jurors were. The jurors got a good look at Mr. Barber with his hands in cuffs and his legs in cuffs and the noise it was making.

(*Id.*). The court denied the mistrial motion (*Id.* at 1174), but it did call the jury back into the courtroom for the following exchange:

> [The Court:] First of all, to ask each of you individually, and I won't call you by name, but I want to ask you as [a] group and individually, of course, if anything has occurred during your deliberations, during any break or at any other time that has caused you to be prejudiced or biased about this case in any way. In other words, your obligation is to follow the law as I give it to you and you determine what the evidence is from the witness stand. So the simple question is: Has

anything compromised that for any of you[?] If it has in any way let me know immediately.

(No response.)

[The Court:] No response. All right.

(*Id.* at 1174-75).

Jurors also saw Barber in handcuffs when they watched Barber's third videotaped statement, during which he confessed to killing Epps.[20] As the state court explained, Barber was "clearly wearing handcuffs during the interview." *Barber*, 952 So. 2d at 446. However, the court also noted that "because the videotape is blurring in places, the handcuffs are not plainly visible all of the time." *Id.* "Rather, they are more noticeable when [Barber] is moving his hands." *Id.*

On direct appeal, the Alabama Court of Criminal Appeals rejected Barber's claim based on jurors seeing him shackled and handcuffed in the hallway and handcuffed during his videotaped confession. The court observed that Barber "did not wear handcuffs and shackles throughout the trial," but only "going to and from the courtroom." *Id.* at 445. The court also noted that, immediately after the hallway sighting, the trial judge asked the jurors if anything they had seen during a break or at any other time had caused them to be prejudiced or biased about the case, and none of the jurors indicated any such prejudice or bias. *Id.* Finally, the court emphasized that the defense did not object to the admission of the videotape on the ground that Barber was handcuffed or ask for a cautionary instruction; that the viewing was on television, not in person; and that Barber did not wear handcuffs or shackles during the actual trial. *Id.* at 446. Under these circumstances, the state court found Barber's unconstitutional-shackling claim meritless.

---

[20] The Alabama Court of Criminal Appeals specifically found that Barber "was wearing handcuffs only during the third videotaped statement." *Barber*, 952 So. 2d at 443. Barber has not challenged that factual determination in this court.

The state court's decision was not contrary to or an unreasonable application of clearly established law, beyond the possibility for fairminded disagreement. Under clearly established Supreme Court precedent, "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005). But, critically, the Court in *Deck* considered only the "routine use of visible shackles" during actual trial proceedings—not the brief, happenstance exposure to a shackled defendant being transported outside the courtroom, as occurred in this case. *Id.* at 626-29.[21] The history and case law the Court relied on in *Deck* emphasized the importance of a defendant's right to appear without shackles *at his trial*—not as he was being transported to or from the place he would stand trial. *Id.* at 626 (collecting authorities and observing that this rule "was meant to protect defendants appearing *at trial before a jury*") (emphasis added). And neither *Deck* nor any other Supreme Court case Barber cites addressed the constitutionality of jurors viewing a video recording in which the defendant was handcuffed. Accordingly, the state court did not act contrary to or unreasonably apply *Deck* in rejecting Barber's claim.

The other cases Barber cites in support of this claim also provide no basis for habeas relief. *See Estelle v. Williams*, 425 U.S. 501, 503, 505 (1976); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970). *Estelle* held that a state may not constitutionally compel defendants to wear prison garb at trial; it did not address shackling at all. 425 U.S. at 512. *Holbrook* held that the Constitution permitted having uniformed security officers sit in the first row of the courtroom's spectator section because that arrangement was not

---

[21] The defendant in *Deck* was not in fact visibly shackled at the guilt phase of his trial. 544 U.S. at 624. Deck was instead challenging the use of visible shackles at the penalty phase of his capital trial, but the Court nonetheless ruled on the constitutionality of guilt-phase shackling in the course of ruling on his penalty-phase shackling claim. *Id.* at 625-30.

"the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." 475 U.S. at 568-69. To be sure, *Holbrook*'s condemnation of shackling was dictum, not a holding—there was no claim of shackling in that case. But, because that dictum became a holding in *Deck*, the more important point is that *Holbrook* referred to shackling in the context of evaluating a conspicuous courtroom practice -- placing uniformed security guards in close proximity to the defendant -- that persisted throughout the course of a defendant's entire trial. *Id.* at 562-66. No such conspicuous, persistent, and prejudicial courtroom practice is at issue here, where jurors only viewed Barber in restraints in a videotaped interview and on a single, accidental occasion in which three jurors viewed him while he was being transported outside the courtroom.

Finally, *Allen* involved an extreme situation in which a pro se criminal defendant verbally abused the trial judge and jury members, tore open his court file and threw papers on the floor, and so obstinately refused to cease his disruptive conduct that the trial judge ordered him removed from portions of his trial. 397 U.S. at 339-41. The Supreme Court held that the trial court committed no constitutional error in removing the defendant from the courtroom for parts of his trial, under those extreme circumstances. *Id.* at 347. In response to the lower court's suggestion that the trial court might have ordered Allen bound and gagged but kept him present for his trial, the Court observed, "in some situations . . . binding and gagging might possibly be the fairest and most reasonable way to handle a defendant who acts as Allen did here." *Id.* at 344. But it also wrote, "even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort." *Id. Allen* thus recognized that it might sometimes be permissible to bind and gag a defendant *in* the courtroom, as a last resort. It certainly does not establish that brief exposure to a shackled defendant *outside*

the courtroom, or viewing a videotaped interview of a handcuffed defendant, violates the Constitution. Barber is not entitled to habeas relief on this claim.

### O.    Barber's Cumulative-Effect Claim

Finally, Barber claims that the cumulative effect of the alleged errors in his trial discussed above violated his federal constitutional rights. (Doc. # 1 at 162). The Alabama Court of Criminal Appeals rejected this claim on direct appeal, *Barber*, 952 So. 2d at 463, and Barber has not shown that its decision was contrary to or an unreasonable application of clearly established Supreme Court precedent. In support of this claim, Barber cites *Kyles v. Whitley*, 514 U.S. 419, 421 (1995), which held that *Brady* claims must be evaluated based on "the cumulative effect of all [favorable] evidence suppressed by the government." *Kyles* did not hold that discrete claims of constitutional error must be evaluated cumulatively; it only addressed the scope of the suppressed evidence relevant for assessing a *Brady* claim. Moreover, the state court made clear that it "considered the allegations of error cumulatively" and did "not find that the accumulated errors have probably injuriously affected [Barber's] substantial rights." *Barber*, 952 So. 2d at 463 (internal quotation marks omitted). That conclusion was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, so Barber is not entitled to habeas relief on this claim.

## IV.    Conclusion

For all these reasons, and after careful review, the court concludes that Barber's petition (Doc. # 1) is due to be denied. A separate order will be entered.

**DONE** and **ORDERED** this March 8, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE